THE TOWN OF EAST HARTFORD, PLAINTIFF IN ERROR, *v.* THE HART-
FORD BRIDGE COMPANY.

From the year 1681 to 1783, a franchise in the ferry over the Connecticut River be-
longed to the town of Hartford, situated on the west bank of the river.

In 1783, the legislature incorporated the town of East Hartford, and granted to it
one half of the ferry during the pleasure of the General Assembly.

In 1808, a company was incorporated to build a bridge across the river, which, being
erected, was injured and rebuilt in 1818, when the legislature resolved that the
ferry should be discontinued.

This act, discontinuing the ferry, is not inconsistent with that part of the Constitu-
tion of the United States which forbids the States from passing any law impairing
the obligation of contracts.

There was no contract between the State and the town of East Hartford, by which
the latter could claim a permanent right to the ferry. The nature of the subject-
matter of the grant, and the character of the parties to it, both show that it is not
such a contract as is beyond the interference of the legislature.

Besides, the town of East Hartford only held the ferry right during the pleasure of
the General Assembly, and in 1818 the latter expressed its pleasure that the ferry
should cease.

After the year 1818, the legislature passed several acts contradictory to each other,
alternately restoring and discontinuing the ferry. Those which restored the ferry
were declared to be unconstitutional by the State courts, upon the ground that the
act of 1818 had been passed to encourage the bridge company to rebuild their
bridge, which had been washed away. But these decisions are not properly before
this court in this case for revision.

The town of East Hartford, having no right to exercise the ferry privilege, may have
been correctly restrained, by injunction, from doing so, by the State court.

THIS was a writ of error to the Supreme Court of Errors for
the State of Connecticut.

The defendant in error filed its petition in the Superior
Court, holden at Hartford, for an injunction restraining the
town of East Hartford (plaintiff in error), its servants, agents,
&c., from the use of a certain ferry over the Connecticut River,
and from receiving tolls, &c. Upon the hearing of the cause
on petition, answer, and the report of a committee appointed
to inquire into the facts, the injunction was granted; and upon
being carried to the Supreme Court of Errors, the decree of the
court below was affirmed. Whereupon the case was brought
here by writ of error, under the twenty-fifth section of the Ju-
diciary Act.

The report of the committee was as follows, omitting the
documents referred to therein, and which were appended to the
report.

" To the Honorable Superior Court, to be holden by adjourn-
ment at Hartford, in and for the County of Hartford, on
the second Tuesday of June, A. D. 1843:

" At an adjourned term of said court, holden at said Hart-
ford on the 1st day of May, 1843, upon a bill in equity then
and there pending before said court, in which bill the Hartford

Bridge Company is complainant, and the town of East Hartford and Samuel Brewer, of said town of East Hartford, are respondents, the subscribers were appointed a committee to find and report to said court, at an adjourned session thereof, to be holden at Hartford aforesaid, on the second Tuesday of June, 1843, the facts in said bill, and the answer thereto. And having duly notified the parties of the time when, and the place where, we would meet and hear them in relation to the facts in said bill and answer contained, we, in conformity with said notice, met the parties on the 6th day of June instant, at the city court-room in the said town of Hartford, and, having been first sworn according to law, fully heard them, from day to day, by their counsel and with their testimony and witnesses, and now find and report the facts following, viz.: That in the month of December, 1681, the town of Hartford passed a vote regulating the tolls to be taken at the ferry over Connecticut River, between said town of Hartford and what is now the town of East Hartford; which appears by a copy of said vote hereunto attached, and marked A. That on the 31st day of March, 1682, said ferry was, by said town of Hartford, leased to Thomas Cadwell for the term of seven years; a copy of which lease is attached hereunto, marked B. That on the 13th day of December, 1687, said lease was renewed to the same Thomas Cadwell for the further term of seven years; a copy of which renewal is attached hereunto, and marked C. That on the 27th day of December, 1694, said town of Hartford chose a committee to contract with some person to take the ferry upon the best terms in their power; of which vote a copy is attached hereunto, marked D. That on the 15th day of January, 1695–6, said committee engaged the said Thomas Cadwell to take the ferry aforesaid for seven years; of which lease a copy is hereunto attached, marked E. That at the session of the legislature in October, 1695, the tolls to be taken, both at the Hartford and Windsor ferries, were regulated by law, as will appear by an act in the edition of statutes, 1695. That the tolls or fares to be taken at the Hartford ferry were regulated by legislative enactments, as appears in the edition of statutes, 1808. That from the year 1681 until October, 1783, said ferry continued to be the franchise of said town of Hartford, and during that period was used and enjoyed as such by the town of Hartford alone; but that the legislature, at their session in October, 1783, incorporated the town of East Hartford, granting to said town of East Hartford one half of said ferry during the pleasure of the General Assembly; a copy of which act is hereunto attached, marked F. That said town of Hartford, on the 1st day of February, 1810, for the considera-

tion of an annual rent of forty-five dollars, leased its moiety of said ferry to Daniel Buck and Elisha Williams for the term of five years, and that the payment of the rent reserved in said lease was duly made by said lessees up to the year 1814, when, in consequence of the reduced travel across said ferry, said town of Hartford exacted of said Buck and Williams no rent thereafter; but that certain individuals interested in the business and real estate on Ferry Street, in said town of Hartford, and others, at their own expense, procured a ferry-boat, which was run across said ferry, and from which they received no toll whatever, and no compensation, other than an allowance made by the ferryman for the use of the boat, the town of Hartford making no opposition to this use of their right, which continued until the year 1818. That at the session of the General Assembly in October, 1808, upon the petition of John Watson and others, an act or resolve was passed incorporating the said John Watson and others by the name of the Hartford Bridge Company, and granting them liberty to erect a bridge across Connecticut River, and to raise and build a causeway through the meadows of East Hartford; which act or resolve is made a part of this report, and is contained in the volume of Private Acts of the State of Connecticut, at the 254th page. That the petitioners, in pursuance of said charter or act of incorporation, erected a bridge across said Connecticut River, and built said causeway through the meadows of East Hartford, and in all things pursued the provisions contained in said act of incorporation, except that said bridge was not so erected that the travel was on a horizontal line in the chord of the arch, nor were the piers as high as contemplated by the act of incorporation; but said bridge and causeway, after the same were completed, were accepted by John Cadwell, Jonathan Brace, and Andrew Kingsbury, Esquires, a standing committee by the General Assembly appointed in said act of incorporation, for all the purposes mentioned in said act, whose certificate, marked G, is hereunto attached; and that no objection to the mode or manner of the erection of said bridge in not having the travel thereon on a horizontal line in the chord of the arch, nor to the height of said piers, has been made known until after the petition which the petitioners preferred to the October session of the General Assembly in the year 1817; but that the General Assembly has once and again acted upon the subject of the tolls of said bridge, and other interests appertaining thereto, and granted the petitioners a new charter in the year 1818, without claiming that the charter of 1808 was forfeited by a noncompliance with any of the conditions thereof. That the petitioners, on the 3d day of October, 1817, made application

to the General Assembly for a discontinuance of said ferry between the towns of Hartford and East Hartford; which petition is hereunto attached, marked H; upon which petition the General Assembly passed a resolve or act; which resolve or act is copied, and is hereunto attached, marked I. That under said resolve the petitioners expended large sums in the repairs of said bridge and causeway, under the inspection of the said John Cadwell, Jonathan Brace, and Anthony Kingsbury, Esquires, who, by said act or resolve, were by said General Assembly constituted a committee or commissioners to superintend the repairs on said bridge and causeway. That in erecting or repairing said bridge, the petitioners, from time to time, received directions from said committee or commissioners, which directions were followed and obeyed, and said causeway and bridge were repaired and ready for the accommodation of the public on the 1st day of December, 1818, as appears by the certificate of said committee or commissioners hereunto attached, marked K; but in the erection of said bridge by the petitioners, that part of the wood-work or floor of said bridge which is opened or unfolded for the passage of vessels, was constructed only 24 feet 7 inches wide, while the space underneath, between the abutment and pier of said bridge on the west side, through which the hull of vessels must pass, is more than 30 feet wide. That no delay has ever been occasioned to any vessel in passing through said bridge for want of space or room through which to pass; nor does it appear that any objection against the width of the passage through said bridge was ever raised by the public, or by those who are in the habit of passing with their vessels through said bridge, until after the year 1836. And this committee are of opinion, and do find, that, notwithstanding the opening in the wood-work of said bridge, through which vessels are to pass, does not exceed 24 feet 7 inches in width, yet there is adequate room for the accommodation of all who have occasion to pass through said bridge with their vessels, and no inconvenience is suffered by the public in consequence of the narrowness of the passage through the wood-work of said bridge. And although the rights of the petitioners in relation to said bridge, and their compliance with or violation of the terms and provisions of their several charters, have been frequently, both incidentally and directly, the subjects of discussion and debate before the General Assembly, and their decision upon said points been had, yet has no real or apparent noncompliance on the part of the petitioners with the terms or provisions of the charter of 1818, in neglecting to make the opening in the wood-work of said bridge for the passage of vessels wider than 24 feet 7 inches, ever been deemed or adjudged by

said General Assembly a violation of said charter, or a forfeiture thereof, notwithstanding they have once and again been urged to come to such a conclusion. That on the 21st day of April, 1837, S. W. Mills and others preferred their petition to the General Assembly of said State, to be holden at Hartford on the first Wednesday of May of the same year, complaining, among other things, of the width of the draw of said bridge; a copy of which petition is hereunto attached, marked L; upon which petition, at the same session of the General Assembly, a report of the joint standing committee on roads and bridges was made and accepted; a copy of which is hereunto attached, marked M. That when the town of Manchester, by an act of the General Assembly, passed at their session in May, 1823, was incorporated into a town, and set off from said town of East Hartford, no notice was taken in said act of the interest of said town of East Hartford in said ferry; which act incorporating said town of Manchester may be found on the 1155th page of the private acts or laws of the State of Connecticut, and is made a part of this report. That after the passage of the act of the year 1818 by the General Assembly, and the discontinuance of the ferry between the towns of Hartford and East Hartford, the town of Hartford, at an adjourned town-meeting holden in said town on the first Monday of December, 1835, passed several votes; copies of which votes are hereunto attached, marked N; and that prior to the year 1818, and the passage of the act of the General Assembly granting to the petitioners permission to erect a new bridge; the inhabitants of said town of Hartford, at an adjourned town-meeting by them holden on the 29th day of December, 1817, passed a vote, a copy of which, marked O, is hereunto attached. That at the session of the General Assembly in May, 1836, an act was passed, repealing so much of the act of 1818 as abolished or discontinued the ferry between the towns of Hartford and East Hartford; which act is made a part of this report, and is on the 565th page of the private acts or laws of the State of Connecticut; which act or resolve was passed upon the petition of Caleb Stockbridge and others; to which petition the towns of Hartford and East Hartford were made respondents. That said General Assembly, at their session in May, 1842, passed a resolve, which is made a part of this report, and is found on the 21st page of the resolutions of the General Assembly, passed May session, 1842. That on the 14th day of May, 1842, application was made by the agent and attorney of the petitioners to several of the selectmen of said town of Hartford, for the purchase of the right of said town of Hartford in and to said ferry. That several of

said selectmen, to whom said application was made, did not suppose that said town of Hartford had an interest in more than a moiety of said ferry, although they had been from time to time conversant with all the facts in relation to said ferry, and the various claims concerning the same, made before the legislature when the rights of the petitioners and of said town of East Hartford were discussed, and the petitioners claimed that neither the town of Hartford nor East Hartford had any right to said ferry, but that said selectmen subscribed an instrument or indenture, a copy of which, marked R, is hereunto attached, subject, however, to the approval of the inhabitants of said town of Hartford, to be expressed at a town-meeting to be subsequently held; and that on the 18th day of May, 1842, said town of Hartford, at a special town-meeting on that day held, by virtue of warning which is hereunto attached, marked S, approved of said indenture or instrument thus executed previously by said selectmen of said town of Hartford; and we find that the agent and attorney of the petitioners, when negotiating with said selectmen in relation to the purchase by the petitioners of the right of said town of Hartford in and to said ferry, distinctly stated to said selectmen that the object of the petitioners, in purchasing the right of the said town of Hartford in and to said ferry, was to enable the petitioners to commence some process before a court of law or equity, by which the questions at issue between the petitioners and the town of East Hartford might be finally decided. That the whole negotiation between the agent and attorney of the petitioners, and said selectmen and town of Hartford, was fairly and honestly conducted. That the petitioners paid to said town of Hartford the first annual payment due on said instrument, in the month of September, 1842. That from time immemorial, until the year 1818, no boats, other than flat-bottomed scow-boats, moved by oars, had been used on said ferry, but that, from the year 1836 until this time, said town of East Hartford, when using said ferry, has run a horse-boat at said ferry. That with the exception of the time when the bridge of the petitioners has been impassable, and said town of Hartford has by law been compelled to keep up said ferry, the said town of Hartford has not made any use of said ferry as a franchise, or derived any benefit or emolument therefrom, since the year 1814. That from the time when the bridge of the petitioners was completed, in the year 1818, until after the passage of the resolve of the General Assembly in May, 1836, said ferry between the towns of Hartford and East Hartford was not used as a public ferry, and no boats during said time were kept thereat by said towns of

Hartford and East Hartford, or either of them, to transport and convey passengers, freight, &c.   That from the time when said ferry between the towns of Hartford and East Hartford was restored by the General Assembly, in 1836, until it was discontinued, in 1841, the town of East Hartford has received for ferriages and tolls collected at said ferry, which during said time has been carried on solely by said town of East Hartford, a large sum of money, viz. more than ten thousand dollars. That, after the year 1814, the ferry between said towns of Hartford and East Hartford was not kept up by both or either of said towns, but that individuals, upon their own responsibility and at their own cost and charges, managed said ferry, and collected toll thereon, until the bridge first erected by the petitioners was partially or wholly destroyed, in the year 1818, when by law said towns of Hartford and East Hartford were compelled to keep boats at said ferry for the accommodation of the public travel, which the said town of Hartford relinquished and abandoned as soon as the petitioners rebuilt or repaired their said bridge, the erection of which relieved the said towns of Hartford and East Hartford from the necessity and expense of maintaining boats suitable for crossing the meadows in time of flood.   That since the completion of the first bridge of the petitioners, in 1811, the petitioners have ever been accustomed to take toll according to law of all who have made use of th said bridge, nor has any person disputed or resisted their right upon the pretence that either the first or the second bridge was not constructed according to the provisions of their several charters or grants.   That the petitioners, since the purchase by them of the right of the town of Hartford in and to said ferry, have not run any boat across said ferry, nor made any provision for the accommodation of the public travel at said ferry, nor commenced, until the date of this petition, any suit at law or bill in equity against the respondents, or either of them.   The committee further find, that the petitioners have invested in said bridge and causeway a large sum of money; that the bridge and causeway erected by them under the grant or charter of 1808, and which was accepted and approved by the commissioners or standing committee appointed by the General Assembly, cost more than ninety-six thousand dollars; that to reconstruct said bridge under the grant or charter of 1818, and to rebuild said causeway, and make therein and in said bridge such alterations and improvements as were directed by the act of the legislature, the petitioners expended about thirty thousand dollars; and that, for various other repairs and expenditures on said bridge and causeway, the petitioners have disbursed a further

sum of forty-seven thousand dollars and upwards; so that the standing committee or commissioners on said bridge, when settling the accounts of said Hartford Bridge Company, on the 12th day of April, 1842, found and reported to the General Assembly, that on said 12th day of April, 1842, there was due to the petitioners, for arrears of interest on the capital by them invested, at the rate of twelve per cent. per annum, the sum of $ 227,270.89; that the annual receipts for toll, so far as the same can be ascertained from the treasury-office, are contained in a schedule hereunto attached, marked T. The committee find that Samuel Brewer, one of the respondents, at the time of commencing this petition, was one of the selectmen of said town of East Hartford, and, as agent of said town of East Hartford, had charge of said ferry and of the ferry-boat. And we further find, that although some of the inhabitants of East Hartford, Glastenbury, and other towns, are personally accommodated by a continuance of the ferry, especially when their business in the town of Hartford calls them into State Street, or parts of the town of Hartford lying south of State Street, inasmuch as the distance which they are under the necessity of travelling is considerably diminished, and the toll or fare which they are compelled to pay is less at the ferry than at the bridge, still it is only when the river is low in the summer season, and the weather not windy and boisterous, that the ferry is preferable to the bridge, even to these individuals. But the committee are of opinion, and do find, that said ferry is not of public convenience and necessity, nor do the interests of the community require its continuance. The committee further find, that the bridge of the Hartford Bridge Company, over Connecticut River, is not only highly advantageous to the prosperity and increasing growth of both the towns of Hartford and East Hartford, but is of great public convenience to all who have occasion to cross Connecticut River at this place. That the value of real estate, both in the towns of Hartford and East Hartford, has been greatly enhanced since the erection of said bridge, and in consequence of the facilities of intercourse with the city of Hartford and places contiguous, thereby furnished; and that said bridge is of great public convenience and necessity, and is abundantly adequate to accommodate all who may wish to come to or depart from Hartford across Connecticut River, between the towns of Hartford and East Hartford; neither can the inhabitants of Hartford or East Hartford, nor the community at large, dispense with said bridge. The committee is of opinion, that the real estate in the towns of Hartford and East Hartford, since the erection of said bridge, and by reason of the facilities thereby furnished to travellers and

others, has been increased in value to an amount greater than all that has been expended by the petitioners in the erection and support of said bridge and causeway since the year 1808, and that, were said ferry of public convenience and necessity, it could not be made at all seasons of the year, both by night and by day, so safe and so commodious as the bridge of the petitioners now is and has ever been. That at the time of the passage of the act of 1818, the tolls which the petitioners were before that time authorized to receive were much reduced. That the legislature have from time to time taken into consideration said bridge and ferry, and the interests and rights of the public in relation thereto will appear by several resolves and acts of said legislature, all of which are part of this report, two of which acts are found on the 260th and two on the 261st page of the private laws of the State of Connecticut, and one on the 55th page of the resolves passed by the General Assembly in the year 1839, and two of said resolves are to be found on the 564th and 565th pages of the private acts of the State of Connecticut. That the resolve or act passed by the General Assembly, at their session in May, 1842, restoring to the towns of Hartford and East Hartford the ferry between said towns, was founded upon a report of the joint select committee of the legislature, a copy of which report, marked X, is hereunto attached; to the admission of which report as evidence on the part of the respondents the petitioners objected, and the same was admitted, subject to such objection. That, at a session of the General Assembly in May, 1841, a resolve was passed discontinuing or suppressing said ferry, which act or resolve is hereunto attached, marked Y; which act or resolve was passed upon the report of a committee of said Assembly, a copy of which report is hereunto attached, marked Z; to the admission of which report on the part of the petitioners an objection was made by the respondents, and the same was admitted, subject to said objection. That, at the time when said instrument or indenture between the town of Hartford and the petitioners was executed, a petition in favor of the town of East Hartford was pending before the legislature, to which petition the said town of Hartford and the petitioners in this bill were respondents.

"All which is respectfully submitted by

$$\left.\begin{array}{l}\text{Eb. Learned,}\\\text{John Stewart,}\end{array}\right\}\textit{Committee.}$$

"*Hartford, June* 10, 1843."

The following summary of the legislation of Connecticut on the subject-matter of this controversy will be sufficient to indicate the constitutional question growing out of it.

The act of 1783 divided the ancient town of Hartford (which lay on both sides of the river) into the towns of Hartford and East Hartford, and at the same time the property of the ancient town was also divided; "and the privilege of keeping one half of the ferry," &c., was declared to "belong to East Hartford during the pleasure of this Assembly."

The act of 1806 established the boundaries of the two ferries between the towns of Hartford and East Hartford, and provided "that the occupiers of such ferry, south of said boundaries, shall have the exclusive privilege of taking passengers south of said boundaries, and the occupiers of said ferry north of such boundary shall have the exclusive privilege of taking passengers north of said boundaries."

The act of 1808, which incorporated the Hartford Bridge Company, contained the following proviso, viz.: "Provided, that nothing in this grant shall now, or at any future time, in any way lessen, impair, injure, or obstruct the right to keep up and maintain the ferries established by law between the towns of Hartford and East Hartford," &c.

The act of 1818 provided that, whenever the bridge company should have repaired their bridge, &c., "the ferries by law established between the towns of Hartford and East Hartford shall be discontinued, and said towns shall thereafter never be permitted to transport passengers across said river, unless on the happening of the contingency hereinafter mentioned." The contingency was the non-repair of the bridge, in which case the towns of Hartford and East Hartford were to resume their rights "to occupy and improve said ferries."

The act of 1836 repealed the act of 1818 so far as it interdicted the ferry.

The act of 1841 repealed that of 1836, and the act of 1842 repealed that of 1841, and in the second section provided, that the right of the town of East Hartford to keep and use the ferry, "as possessed by said town of East Hartford prior to said act of 1841, is hereby restored and confirmed," &c.

The cause was argued by *Mr. Chapman* and *Mr. Toucey*, for the plaintiff in error, and by *Mr. Parsons* and *Mr. Baldwin*, for the defendant in error.

*Mr. Chapman*, for the plaintiff in error.

1. The right to the ferry was an absolute title by legislative grant. It is expressly recognized as such in the act of incorporation, and has been held as such ever since 1680. It is averred in the complainant's bill, admitted in the answer, and was found by the committee appointed to inquire into the facts. It must therefore stand as a fact in the case which admits of no question.

East Hartford v. Hartford Bridge Co.

2. The act of 1818 was passed for the purpose of suspending the ferry. It is entirely unconstitutional. It was the suspension of the exercise or enjoyment of a franchise in one corporation for the benefit of another.

3. A moiety of the ferry title, after 1783, has always been in the plaintiff in error, and it has therefore the right to interpose this constitutional objection. The ancient ferry title was in the corporators of the ancient town of Hartford; when the town was divided, their corporate property was divided. The legislature had the mere power of partition. And the act of 1818, even if it was the exercise of a reserved power of partition, could not give the title to the ferry to the bridge company. But the act of 1818 does not purport any such intention; nor did it transfer any title to the corporators of Hartford. It expressly provides for the continuance of the title in the corporators of East Hartford. The right of ferry was admitted in the court below, and that it could not be taken away without compensation. The *principle*, then, is admitted, though its application is denied.

The act of 1836 reëstablishes the ferry right in both towns. This act repeals that of 1818, and the town of Hartford itself, by its vote, aided in procuring this very act. Even, then, if by any legerdemain the title had been entirely in the town of Hartford, here by their own concurrence an act is passed which gives a moiety to East Hartford.

But the consent of Hartford was not necessary to the repeal of the act of 1818. The act of 1836 was constitutional. It sustained the original grant, and stood upon the same footing as the original grant, and could no more be repealed than the original grant.

The act of 1842 establishes the title of East Hartford. The lease of 1842 makes no difference, because it only conveyed that which belonged to East Hartford, which was a moiety. The act of 1806 was an absolute and unqualified grant. Nothing could be stronger or more direct.

The bridge company were incorporated as a bridge company, and could not exercise the ferry franchise. But it is said that there was *non-user* of this franchise for eighteen years, and that this amounted to an abandonment. If, however, the ferry title was abandoned, it was abandoned by both towns. If it was forfeited, it was forfeited to the State. But there was an express prohibition by the State to use this franchise. This would justify the *non-user*.

*Mr. Parsons*, for defendant in error, maintained,—

1. That the ferry franchise, being acquired by user, is only
44*

commensurate with the use, which has always been enjoyed, subject to the control, and dependent upon the will, of the General Assembly.

That from 1695 the General Assembly had prescribed and regulated the tolls to be taken at the ferry, and, in common with the other ferries in the State, had prescribed the size and strength of boats, how they should be manned, the hours of attendance, and every thing connected with the public accommodation.

2. That the ferry had been voluntarily relinquished by the plaintiff from the time the first bridge was opened for travel, in 1811, and by the town of Hartford from 1814, and when so relinquished was purchased by the bridge company by the acceptance of their amended charter in 1818, and being once relinquished, the right was gone for ever. Corning *v.* Gould, 16 Wend. 531, and cases there cited.

3. That if not *voluntarily* relinquished, the ferry was abandoned by non-user, previous to 1836, when it was revived by the General Assembly. A non-user merely for fifteen years, in analogy to the statute limiting the right of entry on lands in Connecticut, creates a perfect presumption of abandonment. Taylor *v.* Hampton, 4 McCord, 96; Lawrence *v.* Obee, 3 Campb. 514; and the above case in 16 Wendell.

4. It is an inherent right of every State government, subject only to the limitations of its own constitution, to appropriate the private property of its citizens for public use at its discretion; and whether it be land, a franchise, or an easement, is wholly immaterial. A contract or grant is subject to the right of eminent domain, and in resuming a grant the State only claims of the grantee the fulfilment of the implied condition on which it was made; and whether compensation is or is not made, it is not within the tenth section of the first article of the Constitution. West River Bridge Co. *v.* Dix, 6 Howard, 507; Mills *v.* St. Clair County, 8 Howard, 569; Enfield Bridge Co. *v.* Hartford and New Haven Railroad Co., 17 Conn. 60.

5. But the charter of 1818 was previous to the adoption of the constitution of Connecticut, and the powers of the State in the premises, under the charter of Charles the Second, were unlimited. Gov., &c., of Cast Plate Manufacturing Co. *v.* Meredith, 4 T. R. 794.

The right of eminent domain belongs to all countries and all States, and is either limited or unrestricted, according to the fundamental rules by which the people have chosen to bind themselves by their State constitution.

6. The town of East Hartford had no right in the ferry except what it derived from its act of incorporation, which might

be determined at the will of the Assembly, and, being determined in 1818, is not a subject-matter of complaint by the plaintiff in error.

On the division of towns, all the corporate property belongs to the old town, unless expressly granted to the new one. Hartford Bridge Co. v. East Hartford, 16 Conn. 172, and cases cited.

That the legislature regarded the rights of the plaintiff in error as temporary, is clear from the facts, —

1st. That the ferry is never spoken of as the East Hartford ferry, but in the regulation of tolls, and in all acts from 1783 to 1818, it is called the Hartford ferry.

2d. In an act passed in 1805, it is enacted that the town of East Hartford, so long as it shall receive any profit from the *Hartford ferries*, shall keep boats to transport passengers across East Hartford meadows, &c.

That both towns regarded the right of the ferry as depending upon the will of the General Assembly is evident; —

1st. Because no one ever attempted to exercise a ferry right between the towns after 1818, except by first obtaining liberty of the General Assembly to exercise such right, which was first granted in 1818.

2d. Neither of said towns ever commenced any process before a judicial tribunal to test its rights during the eighteen years the ferry was suppressed.

3d. The town of Manchester was incorporated in 1823, being taken from said town of East Hartford, but no notice was taken in the act of incorporation of any interest in the ferry. This would not have escaped the attention of the new town, had they supposed that the legislature had exceeded its powers in suppressing the ferry.

*Mr. Baldwin*, on the same side.

What were the rights of the town of Hartford, as against the State?

The town of Hartford was a local and public corporation, established for public purposes pertaining to the internal police and government of the State. Its functions are entirely of a public and municipal character, and are such as from time to time the legislature deem it proper to impose. Its property is holden, not for the private interest of the members of the community, but for the public purposes for which the corporation itself is established.

Towns in Connecticut are charged with the duty of making and maintaining all necessary highways and bridges within their limits, which it is not the special duty of some other cor-

poration or person to support; with the maintenance of the poor, and with certain specified duties of local legislation. They are also represented in General Assembly, — a corporate representation.

They act in the performance of all their public duties as the agents of the government by whom these duties are imposed, upon such terms as the sovereign power deems just and reasonable ; as, for instance, in maintaining the town and State poor.

They are necessarily, as parts of the machinery of government, subject from time to time to the regulation of the sovereign power, which is charged with the promotion of the general weal.

Ferries over navigable waters can only be established by authority of the sovereign power. Being established, when necessary, for the general convenience, the charge of maintaining them may be imposed upon the local communities, in the same manner as the support o. the highways and bridges, which are deemed properly to devolve on towns whose inhabitants have most occasion for their use, and whose general interests are promoted by the facilities they afford, equal to the burden of their support.

Or, if deemed reasonable by the State, these charges may be shared by all who participate in the benefits, by the authorized imposition of reasonable tolls. If this latter mode be preferred, the government has the option either to *impose the duty* with the privilege of such regulated rates of toll as from time to time justice may seem to require ; or to contract with individuals or private corporations to perform the duty for such stipulated mode of compensation as shall be agreed upon by the parties. Or it may divide the burden between such public and private corporations, as is frequently done when towns are required to purchase the right of way, and a private corporation is established to construct a road for the stipulated tolls.

The ferry across Connecticut River appears, from the finding of the committee, to have been maintained by the town of Hartford from its commencement, subject to the regulation of its tolls at the pleasure of the General Assembly.

It was obviously in its origin regarded as a public establishment, the charge of which was imposed as a duty on the town within whose limits it was included, but the expenses of which were to be borne by a tax levied in the shape of tolls by those who had occasion for its use, — like a public office for the fees — not as a privilege for the pecuniary advantage of the town. It was not the case of a risk voluntarily assumed by the investment of capital in a bridge or road, in consideration of expected reimbursement from specified and permanent rates of toll.

As the town extended across the river, it was competent for the legislature to impose the duty of maintaining the ferry without other remuneration than the local benefit, as in the case of roads and bridges; or from time to time to regulate the tolls so as barely to defray the expense. It rested in the discretion and judgment of the legislature; just as it rests in their judgment, in the progress of population, intercourse, and wealth, to determine whether the public necessity requires a bridge or a ferry, and which shall be suppressed or abandoned, if both cannot exist together.

A ferry may not only be suppressed for the purpose of securing a mode of passage more convenient to the public; but its suppression may be ordered from a regard solely to its insecurity as compared to a bridge.

At the time of the suppression of the ferry, in 1818, it was, and had been for years, practically abandoned by the town, and was conducted at their own charge, by individuals who paid no rent. The bridge having been carried away, there was a *public* necessity that it should be rebuilt, and none for the continuance of the ferry, which yet was an obstacle to the rebuilding of the bridge.

What rights, then, had the town of Hartford to its continuance, or to demand compensation for its suppression?

It was established because required by public convenience. It was now a nuisance, depriving the public of the greater benefit of a bridge.

Is the original grant to the town of Hartford to be presumed from the user, by which alone it is proved, to have been made for any longer period than the public convenience might require? Is it to be presumed that a public corporation, itself created for the promotion of the public interest, subject to be divided or dissolved at the pleasure of the General Assembly, was vested with a power of perpetuating a ferry after it had become prejudicial to the public, and against the will of the supreme power of the State?

Towns are not established by contract with the inhabitants. They are public institutions, — political organizations performing functions ancillary to, and in lieu of, the government of the State. Hence, being created without regard to private emolument, whatever functions they are permitted to exercise are necessarily subject to the control of the sovereign power. 4 Wheaton, 518; 4 Pet. Cond. 540; 9 Cranch, 43; 4 Pet. Cond. 562; 6 How. 548.

To apply these principles to the facts in this case.

The public necessity required a bridge. The bridge corporation had expended $96,000; and their bridge was carried

away.   It could not in the opinion of the legislature be rebuilt
if the ferry was continued.   The inhabitants of the town of
Hartford would derive a benefit from the erection of the bridge
in the enhanced value of their land, to an amount exceeding
its cost.

It was the duty of the sovereign power to cause a bridge to
be erected, because the public convenience and necessity re-
quired it.   And it was desirable that the tolls allowed by the
old charter should be reduced.

The State might cause it to be erected at its own expense, by
a general tax; or make it the duty of the county, or the town
of Hartford, or the two towns, to build it at their own expense,
wholly or in part (in the case of New York canals, people taxed
twenty-five miles each side); or charter a private corporation to
build it wholly at its own charge for the specified tolls; or partly
at the charge of the towns most benefited, so that the tolls on
the people of the State generally might be diminished.   That
would seem to be equitable.

This is almost always done in the laying out of turnpike
roads.   It was done in the case in 6 Howard; the town of
Brattleboro being required to pay for the West River Bridge
$ 4,000 in order to make it a free bridge.

Upon what principle is this required ?   The property of the
inhabitants of the town is taken for public use to the amount
of $ 4,000.   Why ?   Because the improvement is one from
which the inhabitants of the local community derive a special
benefit.   It takes so much of their property for public use, with-
out other compensation than the benefits it supposes they will
derive from the improvement.   The legislature judges in regard
to the sufficiency of the compensation, as it always does when
it taxes or authorizes a local community to tax its inhabitants
for a local improvement.

The sovereign power may levy its tax on the inhabitants of
the town, or it may require the town to pay it from its treasury,
leaving them to replenish their treasury by taxation as they
may think fit.

If, instead of requiring the payment of money from the
town treasury, the legislature deems it better to take other
property of the town, the continued use of which would be
incompatible with the enjoyment by the inhabitants of the
benefit of the improvement, what is the objection ?   The prin-
ciple is the same; the mode of payment only differs.

Suppose the legislature had said, If the bridge company
will rebuild the bridge in the manner we prescribe, and will
consent to a reduction of the tolls, the towns of Hartford and
East Hartford shall pay towards the cost $ 10,000; will any

East Hartford v. Hartford Bridge Co.

body. pretend that that would be any violation of the Constitution of the United States? Is it not a matter about which the State legislature are the proper and exclusive judges? Surely, if they could require a payment in money, they can, if important for the accomplishment of the object, require the abandonment of a public franchise which interferes with the bridge.

It would seem to be very clear, that it could never have been the intention of the framers of the Constitution, to interpose the power of this government between the sovereign power of a State and one of its public corporations. All questions relating to the local corporations of a State are questions which are exclusively addressed to the power of the State which establishes them, and which can alone judge intelligently, in view of all its domestic policy and interests, of the propriety of the regulations it may adopt.

Even as to the property of individuals, the legislature of Connecticut, prior to the adoption of the constitution of September, 1818, — much more as to that of its public corporations, — was governed only by its own sense of justice. The people of the State had confided the sovereign power without limit to the legislature. (See Charter.)

But I apprehend, that, when there is a constitutional provision that private property shall not be taken for public use without compensation, it is to the State tribunals, and to them alone, that an individual, whose property has been taken in the exercise of the power of eminent domain, must look for redress. The constitution of the State, and not that of the United States, is violated.

This, I take it, has been explicitly decided by this court, in 6 Howard, 507, and in 8 Howard, 584. In the last case, the complainants exhibited a grant to land, vesting the fee-simple title. The State authorized three hundred feet of their land to be taken, when only one hundred were necessary. The bill charges it as oppressively taken. The demurrer admits it. The Supreme Court say it was illegal, and void if so.

But that does not give this court jurisdiction. "It is not an invasion and illegal seizure of private property, on pretence of exercising the right of eminent domain, that gives this court jurisdiction. Such a law, &c., is not a violation of a contract in the sense of the Constitution." It rests with the State legislature and State courts to protect their citizens from injustice of this description. "The framers of the Constitution never intended that the legislative and judicial powers of the general government should extend to municipal regulations

necessary to the well-being and existence of the States." 8 Howard, 584.

The right of eminent domain is the right of civil government over all the territory and persons within the limits of a State, notwithstanding its grant of the property to individuals. It is a right paramount to, and unaffected by, the grant. It forms no part of the contract. It is a right inherent in the sovereignty of the State, to be exercised in cases of necessity. Until the necessity arises, the grantee's right of property is absolute. It is a power of government, — not an interest in the property, — a latent power called into activity by reason of the necessity that exists for its exercise, and not of any preëxisting contract. It exists to the same extent over property derived from another, as from the State itself. Thus, for example, when a State is admitted to be formed out of a territory, the property in the land is in the United States and its grantees, the eminent domain is in the State; or, in other words, the right of civil government. The right is as absolute as the necessity which calls for its exercise. The duty to make compensation is to be regulated by the sense of justice of the sovereign power, or by the constitution of the State.

It is no part of the contract or grant of the title, that the government will make compensation, if a public necessity should require the taking of the land for public use. It is to be presumed it will do so in all cases proper for compensation, where there is no constitutional requirement; and where there is, the party wronged has recourse to the judicial tribunals of the State for redress for a violation of the constitution of the State, not of the United States.

There is no necessity to presume a contract to entitle the party to redress. But it is necessary that there should be a contract violated to give this court jurisdiction.

If it has been shown that the town of Hartford would have no right to complain of the act of 1818 as unconstitutional, *a fortiori* East Hartford has none.

But suppose the town of Hartford might complain, no rights of East Hartford were violated. That corporation had no rights except such as were granted during the pleasure of the General Assembly.

Why were they so granted? For some purpose, — what? It could be only for one of two purposes; — 1st. To enable the General Assembly to do justice to the town of Hartford by restoring it after a reasonable time; or 2d. To manifest its own power to regulate and control it. East Hartford, taking the grant with a reservation, cannot repudiate the limitation of her right, and claim the grant as absolute.

East Hartford v. Hartford Bridge Co.

But it is said by the plaintiff in error, that the people of East Hartford always had an undivided interest as corporators, which the legislature could only assert. Not so. The inhabitants had no private interests in this ferry. · The town as a corporation held it, and the use was wholly public.

The legislature, on dividing the two towns in 1783, if they had deemed it best, might have left the ferry wholly to the management of the old town, as better qualified to serve the public. If they had made no direction, it would have remained in Hartford.

East Hartford had, then, just what interest the legislature thought proper to grant it.

What was the nature and extent of that grant? Who shall interpret it? Who but the courts of the State? They have interpreted it to be simply a grant *determinable at the pleasure of the General Assembly.* How can this court say that a just apportionment of the property and burdens of the old town required any thing more?

If not, no matter whether the charter of 1818 was a suspension or an abrogation of the right. So long as the use of it is inhibited, it becomes an illegal disturbance of our right.

The act of the legislature for the suppression of the ferry, in the day and time of it, was acquiesced in by both towns, for a period long enough to warrant a presumption of abandonment. The Supreme Court say that it was so acquiesced in and abandoned. It would not be necessary, therefore, for the court in Connecticut to have decided any thing else. They might have admitted the invalidity of the act of 1818 as to both towns, and yet held the decision of the court below right, on the ground of waiver and abandonment.

*Mr. Toucey*, in reply.

1. The first question is, whether there is a contract under which the plaintiff may claim.

2. Whether that contract has been impaired in its obligation by legislative act, as enforced by the judgment or decree.

The ancient ferry title was an absolute title by legislative grant, alleged in the bill, admitted in the answer, found by the committee, upheld by all the legislation of the Colony and the State (except the suspension) by the acts of 1680, 1783, 1806, 1808, 1818, 1836, 1842, admitted by the bridge company's lease from Hartford, and admitted by the Supreme Court of Connecticut as to Hartford. 17 Conn. 91; Baldwin v. Norton, 2 Conn. 161; Gaylord v. Couch, 5 Day, 223.

It has been urged and relied on by the other side, being what the committee have found, though not put in issue, "that the

tolls or fares to be taken at the Hartford ferry were regulated by legislative enactments, as appears in the Ed. of Stat. 1808." Now the only instance shown in the Statutes of 1808 is where the fares are enlarged. And has it ever been doubted that the legislature may enlarge the liberties of a franchise? How, then, could acts of the legislature enlarging the ferry rights be construed as exercises of the restraining power of the legislature contended for in this case?

The acts of May and October, 1806, permanently and finally fixed the boundaries between Hartford and East Hartford. Before that time the boundaries had been settled only during the pleasure of the Assembly, by giving for the present an undivided moiety to each. But the acts of 1808 purport to fix and establish the boundaries as they shall remain. The only power of the legislature was to make a partition of the property, upon a division of the town. They divide it for the time being by giving a moiety to each. But the acts of 1808 fixed the boundaries for ever. The very act incorporating the bridge company recognized the rights of the ferry-owners, by enacting that nothing in that grant should lessen, impair, &c., the ferries established by law. And even the act of 1818, of which we complain, recognizes the same title, so that, if the bridge were destroyed, the ferry rights would be reserved. Then comes the act of 1836, which sets the ferries up again, and the act of 1842 further establishes and confirms the ferry rights.

Next as to the interest of the plaintiff in error. The corporators of East Hartford were part owners from 1680 to the present time, not excepting the suspension. They were joint tenants to 1783, — 103 years; owners of an undivided moiety from 1783 to 1806; and owners of one ferry in severalty from 1806 to 1841. The legislature had the power of division, and the power of division only. If that was exercised, it was exhausted. If it was divided, it was divided for ever. That which was given to each, was given to it for ever. No power of partition remained after the act of 1806. The act of 1818 does not purport to divide the ferry right. There was no intent to terminate the title of East Hartford, or transfer it to Hartford, in that act. Its transfer was effectually interdicted. Then there is an express provision for continuance of title in East Hartford. The act itself is not a termination of title, but a partial, conditional suspension only.

But we are told that the act of 1836 has been decided by the State court to be unconstitutional, and that therefore it cannot be brought here for revision. Well, it is true that, where the State court has decided one of the State laws to be unconstitutional, that decision cannot be brought here for reversal. But

in a collateral way this court may determine the same law to be constitutional. For if this court should be of opinion that the act of 1818 was unconstitutional, they could hardly be bound by the decision of the State court upon the unconstitutionality of the act of 1836, founded entirely upon its interference with the right growing out of the act of 1818. Williamson *v.* Berry, 8 Howard, 495.

The act of 1836 was constitutional, for the reason that the act of 1818, with which it conflicts, was unconstitutional; and this confirmation is as irrepealable as the original grant. The act of 1841 purports to repeal that of 1836 and reëstablish that of 1818. Certainly no new right could be acquired under this act.

Was the suspension of the ferry right constitutional? The act of 1818 was not a grant of the old ferries to the bridge company. It was not a grant of an exclusive franchise within certain limits, including the old ferries. The legislature might cover the river with bridges or ferries without infringing the act of 1818. It was not the grant of a line of travel. Warren and Charles River Bridge case, 11 Pet. 420. It was not an express grant of the ferry tolls, or any part of them. It was a mere naked suspension of two existing franchises. It was direct legislative action on the contract. It was the interpolation of a new and most important exception into the contract. As interpreted and enforced, it is a transfer of the ferry tolls by implication from the ferry owners to the bridge owners. And this by inference from the assumed legal existence of the suspension. Suppose two competing railroads. Can one be suspended?

It is not done in the exercise of the right of eminent domain. The ferry franchises are not taken. The ferry-ways and ferry-boats are not taken, but remain idle and untouched. No bridge is granted within the exclusive limits of the ferry franchises.

Nothing is taken for public use. The bridge franchise and the ferry franchises had existed side by side for ten years. The bridge company were bound to maintain their bridge under a pledge not to interfere with the ferry.

The avowed object was, not to open a new way by land or by water, but to increase the dividend of the bridge company by the suspension of its rival.

It was a mere act of party legislation, which was in effect an act of plunder, repented of and afterwards repealed as inhibited by the Constitution of the United States.

There was no intention to exercise the right of eminent domain. Not only were neither the franchises nor the visible property taken, nor any thing else for public use, but no compensation was provided. Provision for compensation makes

the difference between public plunder and the exercise of the right of eminent domain. One is rapine, the other is justice. In every case of a franchise (which is necessarily founded in contract) the one is inhibited, the other excepted in the Constitution. No government in the civilized world can make the exercise of this right equivalent to public plunder, without shaking it to its foundations. This was the doctrine of this court in the Warren Bridge case, 11 Peters, 420, and in the West River Bridge case, 6 Howard, 507. In the latter case, the road, abutments, bridge, and franchise were taken for public use *with* compensation. But here the legislature suspends the ferries for the benefit of the bridge company. If I enter into a contract with a man, can the legislature take away that contract? If it be an executed contract, can the sovereign take away the fruits of it? Here, however, the legislature does not pretend to take away the grant, but to alter its provisions, and to alter them not for its own benefit, but for that of another.

Mr. Justice WOODBURY delivered the opinion of the court.

This is a writ of error, under the twenty-fifth section of the Judiciary Act, brought to reverse a judgment rendered by the Supreme Court of the State of Connecticut.

It is claimed by the plaintiff, that the clause in the Constitution of the United States against impairing the obligation of contracts was set up there in defence to certain proceedings which had been instituted against that corporation by virtue of rights derived from legislative acts of that State, which acts the plaintiff insisted had impaired the obligation of a contract existing in behalf of East Hartford.

It being manifest from the record that such a defence was set up, and that the court overruled the objection, so that jurisdiction exists here to revise the case, we proceed to examine whether, on the facts of the case, any such contract appears to have existed, and to have been violated by the State legislation, which was drawn in question.

It will be seen that the point before us is one of naked constitutional law, depending on no equities between the parties, but on the broad principle in our jurisprudence, whether power existed in the legislature of Connecticut to pass the acts in 1818 and 1841, which are complained of in this writ of error.

The supposed contract claimed to have been impaired related to certain rights in a ferry, which were alleged to have been granted by the State, across the Connecticut River. This grant is believed to have been made to Hartford as early as the year 1680, and half of it transferred to East Hartford in 1783. But no copy of the first grant being produced, nor any original

referred to or found, it is difficult to fix the terms or character of it, except from the nature of the subject and the subsequent conduct of the parties, including the various acts of the legislature afterwards passed regula ing this matter.

From these it is manifest, that two leading considerations arise in deciding, in the first place, whether by this grant a contract like that contemplated in the Constitution can be deemed to exist. They are, first, the nature of the subject-matter of the grant, and next, the character of the parties to it.

As to the former, it is certain that Connecticut passed laws regulating ferries in 1695; and Massachusetts began to grant ferries as early as 1644 (Col. Charter, p. 110), and to exercise jurisdiction over some even in 1630 (Charles River Bridge v. Warren Bridge, 11 Peters, 430). In 1691 she provided that no one should keep a ferry without license from the Quarter Sessions, and under bonds to comply with the duties and regulations imposed (p. 280).

In the rest of New England, it is probable that a similar course was pursued by the legislatures, making, as a general rule, the tolls and exercise of the franchise entirely dependent on their discretion. But in some instances the owners of the lands on the banks of small rivers opened ferries upon them, and claimed private interests therein. And in still other cases of public grants to private corporations or individuals, a similar interest has been claimed.

It is highly probable, too, that in some instances public corporations, like the plaintiff in this case, may have set up a like interest, claiming that the subject-matter granted was one proper for a contract, or incident to some other rights, like private interests owned on the bank of a river.

Supposing, then, that a ferry may in some cases be private property, and be held by individuals or corporations under grants in the nature of contracts, it is still insisted here, that the ferry across a large navigable river, and whose use and control were entirely within the regulation of the colonial legislature, and came from it, would be a mere public privilege or public license, and a grant of it not within the protection of the Constitution of the United States as a matter of contract.

But it is not found necessary for us to decide finally on this first and more doubtful question, as our opinion is clearly in favor of the defendant in error on the other question; viz. that the parties to this grant did not by their charter stand in the attitude towards each other of making a contract by it, such as is contemplated in the Constitution, and as could not be modified by subsequent legislation. The legislature was act-

45 *

ing here on the one part, and public municipal and political corporations on the other. They were acting, too, in relation to a public object, being virtually a highway across the river, over another highway up and down the river. From this standing and relation of these parties, and from the subject-matter of their action, we think that the doings of the legislature as to this ferry must be considered rather as public laws than as contracts. They related to public interests. They changed as those interests demanded. The grantees likewise, the towns being mere organizations for public purposes, were liable to have their public powers, rights, and duties modified or abolished at any moment by the legislature.

They are incorporated for public, and not private objects. They are allowed to hold privileges or property only for public purposes. The members are not shareholders, nor joint partners in any corporate estate, which they can sell or devise to others, or which can be attached and levied on for their debts.

Hence, generally, the doings between them and the legislature are in the nature of legislation rather than compact, and subject to all the legislative conditions just named, and therefore to be considered as not violated by subsequent legislative changes.

It is hardly possible to conceive the grounds on which a different result could be vindicated, without destroying all legislative sovereignty, and checking most legislative improvements and amendments, as well as supervision over its subordinate public bodies.

Thus, to go a little into details, one of the highest attributes and duties of a legislature is to regulate public matters with all public bodies, no less than the community, from time to time, in the manner which the public welfare may appear to demand.

It can neither devolve these duties permanently on other public bodies, nor permanently suspend or abandon them itself, without being usually regarded as unfaithful, and, indeed, attempting what is wholly beyond its constitutional competency.

It is bound, also, to continue to regulate such public matters and bodies, as much as to organize them at first. Where not restrained by some constitutional provision, this power is inherent in its nature, design, and attitude; and the community possess as deep and permanent an interest in such power remaining in and being exercised by the legislature, when the public progress and welfare demand it, as individuals or corporations can, in any instance, possess in restraining it. (See Taney, C. J., in 11 Peters, 547. 548.)

In Goszler *v.* The Corporation of Georgetown, 6 Wheaton, 596 – 598, it was held that a city with some legislative power as to by-laws, streets, &c., could, after establishing a graduation for its streets, and after individuals had built in conformity to it, change materially its height. This case appears to settle the principle that a legislative body cannot part with its powers by any proceeding, so as not to be able to continue the exercise of them. It can and should exercise them, again and again, as often as the public interests require. And though private interests may intervene, and then should not be injured except on terms allowed by the Constitution; yet public interests in one place or corporation may be affected injuriously by laws, without any redress, as legislation on public matters looks to the whole and not a part, and may, for the benefit of the whole to the injury of a part, change what is held under it by public bodies for public purposes. The legislature, therefore, could not properly divest itself of such control, nor devolve it on towns or counties, nor cease from any cause to exercise it on all suitable occasions. (Clark *v.* Corporation of Washington, 12 Wheat. 54.)

Its members are made by the people agents or trustees for them on this subject, and can possess no authority to sell or grant their power over the trust to others. Presbyterian Church *v.* City of New York, 5 Cowen, 542; Fairtitle *v.* Gilbert, 2 D. & E. 169.

Nor can the public be estopped by such attempts, since the acts of their agents are to be for the public, and for its benefit, and not for themselves individually, and are under a limited authority or jurisdiction, so as to be void if exceeding it.

Looking to the subject, when, as here, the grantees as well as the grantors are public bodies, and created solely for municipal and political objects, the continued right of the legislature to make regulations and changes is still clearer. Perhaps a stronger illustration of this principle than any yet cited exists in another of our own decisions.

In the State of Maryland *v.* Baltimore and Ohio Railroad, 3 Howard, 551, this court held, that a grant by the legislature to a county of a sum forfeited could be dispensed with by the legislature afterwards, as it was made for public, not private purposes, and to a public body.

There is no private interest or property affected by this course, but only public corporations and public privileges. It may be otherwise in case of private bodies, or individuals, or of private property granted or acquired. The legislature might not be justified to revoke, transfer, or abolish them on account of the private character of the party or the subject.

(Pawlet *v.* Clark, 9 Cranch, 292; Terrett *v.* Taylor, Ib. 48 – 50.) But every thing here is public.

While maintaining the exemption of private corporations from legislative interference, Justice Washington, in 4 Wheat. 659, in the Dartmouth College case, still admits that corporations for "public government," such as a "town or city," are under the control of legislation; whereas private corporations are governed by the statutes of their founders, or by their charters (pp. 660, 661). He remarks further, that the members of such a public corporation "accepted the charter for the public benefit alone, and there would seem to be no reason why the government, under proper limitations, should not alter or modify such a grant at pleasure" (pp. 661, 663). And Justice Story concurs with him by saying: "It may also be admitted, that corporations for mere public government, such as towns, cities, and counties, may, in many respects, be subject to legislative contract." 4 Wheat. 694.

When they are wished to be in some respects not so subject, but to act exclusively, it should be so expressed in the constitutions of their States. What is exclusive in them would there appear expressly, and when it is not, a legislative provision, if made for the purpose of rendering it exclusive, is, for the reasons before stated, doubtful in its validity.

The public character of all the parties to this grant, no less than its subject-matter, seems, therefore, to show, that nothing in the nature of a contract, with terms to be fulfilled or impaired like private stipulations, existed in this case so as to prevent subsequent interference with the matter by the legislature, as the public interests should appear to require.

But in order to justify the plaintiff in what it set up below, there must not only have been a contract, or *quasi* contract, but a violation of its obligation. It will therefore be useful to follow out farther the nature and conditions of this supposed contract, in order to throw more light on both the questions whether this grant was such a contract as the Constitution contemplates, and whether it has been at all impaired. The authority of a legislature may probably supersede such a ferry as is public, and across a great public highway of a navigable river, by allowing a bridge over the same place, as has before been virtually held by this court (11 Peters, 422; 6 Howard, 507). It could also alter or abolish wholly the public political corporation to which the grant was made, as this is yearly done in dividing towns and counties, and discontinuing old ones. It is therefore clear, that, whatever in the nature of a contract could be considered to exist in such a case, by a grant to a town of some public privilege, there must be implied in it

a condition, that the power still remained or was reserved in the legislature to modify or discontinue the privilege in future, as the public interests might from time to time appear to require. Charles River Bridge *v.* Warren Bridge, 11 Peters, 421 ; West River Bridge *v.* Dix et al., 6 Howard, 507.

Accordingly, it is admitted in this case, that the legislature, as early as 1695, in fact regulated the tolls of this ferry, and continued to do it until 1783, when it granted to East Hartford one half of the privilege, and that only " during the pleasure of the Assembly." All concerned in the privilege, therefore, became thus estopped to deny that this ferry was to be used by the town as a mere public license, and to be used in conformity with the views of the legislature as to what in future might be deemed most useful to the community at large.

Because the old town of Hartford acquiesced in this regulation of tolls, and in this transfer of half to East Hartford in this limited or conditional manner, and the latter acquiesced in the acceptance of it on the terms expressed, to hold it during " the pleasure of the Assembly."

Such being, then, the public character of the subject and parties of the grant, and such the terms and conditions of it, — rather than being one of private property, for private purposes, to private corporations or individuals, and absolutely rather than conditionally, — in what respect has it been violated by the legislature ?

No pretence is made that it has been, unless by the discontinuance of the ferry in 1818 and in 1841. The former act of the legislature was passed under the following circumstances : a bridge had been authorized over the river near the ferry as early as 1808, and no provision was then made as to the ferry, probably from a belief that it would, after the bridge was finished, fall into disuse, and be of no importance to any body.

No objection was made or could be sustained to the constitutionality of this incorporation in this way (11 Peters, 420 ; 4 Pick. 463). But when the bridge became damaged greatly in 1818, and the company was subjected to large expenses in rebuilding, the legislature deemed it proper to provide, in its behalf, that the ferry should not be kept up afterwards, except when the bridge became impassable.

The words were, that, " after the company shall have repaired the bridge, &c., the ferries by law established between the towns of Hartford and East Hartford shall be discontinued, and said towns shall never thereafter be permitted to transport passengers across said river," &c.

This bridge corporation, being the present defendant in error, proceeded therefore to rebuild and keep up their bridge in

a more costly manner, and beneficially and safely to the community. They were a private, pecuniary body, and were aided much by the suspension or discontinuance of the ferry in their additional charter.

The legislature, in making the discontinuance, did only what it supposed was advantageous to the public, by securing a better, quicker, and surer method of passing the river on the bridge; and it thus appears to have violated no condition or terms of any contract or *quasi* contract, if it had made any with the plaintiff. 11 Peters, 542.

On the contrary, as before suggested, the legislature merely acted within its reserved rights, and only passed a new law on a public subject, and affecting only a public body. But beside the implied powers continuing in the legislature, as heretofore explained, and which warrant all it did in 1818, and the exercise of which cannot be regarded as impairing any contract, we have seen that there was an express provision in the grant to East Hartford, limiting the half of the ferry transferred to it " during the pleasure of the Assembly."

The legislative pleasure expressed in 1818, that the ferry should cease, came then directly within this condition; and the permission to exercise that pleasure in this way was not only acquiesced in from 1818 to 1836, but was treated as the deliberate understanding on both sides from 1783 to 1836.

The statute-books of Connecticut are full of acts regulating ferries, including this, and modifying their tolls from 1783 downwards, and in many instances imposing new and onerous duties. See 1 Stat. of Conn. 314 to 327.

And to show how closely the power of the legislature was exercised to regulate this matter, without being regarded as impairing in that way any contract or obligation, it appears that when Hartford was incorporated into a city, about 1820 (Rev. Stat. 110), it was expressly provided: " But said city shall have no power to regulate or affect the fisheries in, or the ferry upon, said river" (Connecticut).

Well, too, might East Hartford, in 1783, be not unwilling to take her charter and half the ferry, subject to this suspension; as her own existence at all, then and thereafter, depended on legislative pleasure; and as all the property or privileges of the old town would remain with the old one, when a new was carved out of it, unless otherwise expressly provided. 4 Mass. 384; 2 N. Hamp. 20.

Our inquiries would terminate here, as this legislation, in 1818, is the supposed violation of a contract that was chiefly relied on below, had there not been several other acts of legislation as to this ferry in 1836, 1841, and 1842, some of which

are claimed to have impaired contracts made with the plaintiff, either then or in 1783.

But the act of 1836, about which much has been said in the argument here, and much was very properly urged in the court below, simply repealed that part of the act of 1818 discontinuing the ferry. It thus affected the bridge company deeply and injuriously, but did not impair any supposed contract with East Hartford, was not hostile to its rights, and is not, therefore, complained of by that town, nor open to be considered as a ground for revising the judgment below under this writ of error.

On this see Satterlee v. Matthewson, 2 Peters, 413; Jackson v. Lamphire, 3 Peters, 289; 7 Peters, 243; 11 Peters, 540; Strader v. Graham, *ante*, 82.

The State court, however, pronounced it unconstitutional, and had jurisdiction to do it, and if they had not arrived at such a result, they could not have sustained some of their other conclusions.

This decision of theirs being founded on their own constitution and statutes, must be respected by us, and in this inquiry must be considered *primâ facie* final. Luther v. Borden, 7 Howard, 1, and cases there collected.

We shall, therefore, not revise the legal correctness of that decision, but refer only to a few of the facts connected with the repeal of 1836, and with the decision on it below, so far as is necessary to explain the legislation subsequent to it, and which is yet to be examined.

The legislature does not appear to have proceeded at that time on any allegation of wrong or neglect on the part of the bridge company; nor did they make any compensation to the latter for thus taking from it the benefits of a discontinuance of the ferry, and attempting to revive half the privileges again in East Hartford. The State court appears to have considered such a repeal, under all the circumstances, as contrary at least to the vested rights of the bridge company, and to certain provisions in the State constitution. See, also, The Enfield Bridge v. The Hartford and New Haven Railroad Co., 17 Conn. 464.

But, without going farther into the history of this proceeding in 1836, and the decision on it by the State court, it is manifest that the dissatisfaction and complaints growing out of it, or some other important reason, induced the legislature in 1841 to repeal the repealing act of 1836, and thus to leave the bridge company once more in the full enjoyment of its former privileges after the ferry had been discontinued in 1818.

To this conduct of the legislature the plaintiff in error objected, and under this writ asks our decision, whether it does not impair contracts which had before been made with it by the legislature.   In reply, it need only be stated that we think it does not, and this for the reasons already assigned why it was competent for the legislature to pass the discontinuing part of the act of 1818, if it thought proper, and in this did not violate the Constitution of the United States, as to contracts.

But matters were not permitted to remain long in this position.   In 1842 the legislature proceeded to repeal the act of 1841, and thus sought virtually to restore the ferry to Hartford and East Hartford, as it stood before 1818.   It appears to have done this on the complaint of East Hartford, that half of the ferry had been taken away from her without making " any compensation."

It is unnecessary, in relation to th.s last repeal, to say more than that, like the repeal of 1836, and for like reasons, the State court pronounced it void; and, on the ground before explained, we are not called on by this writ to reconsider or reverse that decision.

It follows, then, finally, that East Hartford, in proceeding to exercise the ferry privilege again since 1842, and to the special injury of the bridge company, has done it without legal authority, and should therefore be restrained by injunction from exercising it longer.

The judgment below must be affirmed.

### _Order._

This cause came on to be heard on the transcript of the record from the Supreme Court of Errors within and for the State of Connecticut, and was argued by counsel; on consideration whereof, it is now here ordered, adjudged, and decreed by this court, that the decree of the said Supreme Court of Errors in this cause be, and the same is hereby, affirmed, with costs.