THE STATE *Ex Rel.* HIBERNIAN SOCIETY, OF CHARLESTON, RESPONDENTS, *vs.* GEORGE ADDISON, CITY SHERIFF, APPELLANT.

THE STATE *Ex Rel.* THE GRAND LODGE OF ANCIENT FREE MASONS OF SOUTH CAROLINA, RESPONDENTS, *vs.* GEORGE ADDISON, CITY SHERIFF, APPELLANT.

An Ordinance of the City Council of Charleston, passed in June, 1793, exempted "all and every * * charitable society from payment of any City taxes now due, or to become due." The Hibernian Society, of Charleston, and the Grand Lodge of Ancient Free Masons, the Relators, became bodies corporate—the first named in 1805, and the last named in 1818—and their real estate consisted of the buildings and premises where they held their meetings. The annual Tax Ordinances from 1844 to 1851, inclusive, expressly exempted from taxation such buildings and premises of charitable societies, but n t the buildings on such lands held by individuals under a lease for a term of five years. After the year 1851, and until the year 1869, inclusive, the annual tax ordinances did not, in express terms, exempt such buildings and premises, but imposed taxes on every house, building, &c., "including every building and improvement on lands under a lease for a term of five or more years, from a * * charitable society." The buildings and premises of the relators were never assessed for taxation until the year 1868, when, tor the first time, they were so assessed.

*Held,* That payment of taxes for the year 1868 could not be enforced; that the City authorities, by excluding the property of the relators from taxation for so long a period of time, had themselves construed the Ordinance of 1793 as including the relators within its terms, as charitable societies; and that it was too late for such authorities now to contend against their own construction, as evinced by long usage—the ordinance still remaining of force.

*Held, further*, That the State Constitution of April, 1868, having declared the property of all societies, with certain exceptions which do not include the re'ators, subject to municipal taxation, it became the duty of the City Council to impose taxes on the relators, and, therefore, that the Ordinance of 1869, though identical in its terms with that of 1868, must be construed as authorizing the imposition of taxes upon the relators, which had also been assessed upon their property for that year.

BEFORE MELTON, J., AT CHAMBERS, COLUMBIA, JULY AND NOVEMBER, 1870.

These were suggestions for writs of prohibition to restrain the City Sheriff of Charleston from enforcing certain tax executions against the relators for taxes assessed for the years.1868, 1869 and 1870.

The facts are stated in the judgment of the Circuit Judge, below given, and the opinion of the Supreme Court delivered by the Chief Justice.

The case in which the Grand Lodge of Ancient Free Masons were the relators was heard in July, 1870, and His Honor ordered a writ to issue prohibiting the defendant, the City Sheriff of Charleston, from enforcing the executions against the relators for the taxes charged for the years 1868 and 1869.

The case in which the Hibernian Society was the relator was heard in November, 1870, and His Honor the Circuit Judge filed his judgment, as follows:

MELTON, J. The office of Circuit Judge for the First Circuit being vacant, this case was brought before me on the 22d of August last, by suggestion, praying for a writ prohibiting the defendant from collecting taxes charged against the relator by the City Council of Charleston for the years 1868, 1869 and 1870. A rule was thereupon issued against the defendant, returnable on the 13th of October, requiring him to show cause before me why the prayer should not be granted. The return was made accordingly, and the cause submitted without argument.

The facts, as made out by the depositions filed with the suggestion, are these: That the Hibernian Society was originally founded in 1801, and on the 17th of March of that year a constitution and by-laws for the government of its members was adopted. The primary and chief object of the organization, as declared in the constitution, was to aid distressed emigrants from Ireland, and to relieve decayed members and the distressed widows and orphans of members; that the society was incorporated on the 19th day of De-

cember, 1805, and its charter has been from time to time renewed; that from its foundation to the present time, the society has been employed in doing works of charity, extending the sphere of its benevolence beyond the limits of the constitution, appropriating all its revenues in fulfillment of the objects of its foundation. The property of the society consists of a hall and grounds on Meeting street, in the City of Charleston, purchased with a fund raised by donations from members, which hall has been rented out from time to time, and the rents expended in works of charity and benevolence. This property has always been exempt from taxation, and no attempt was ever made, either by State or other authority, to impose a tax upon it until the 17th of June, 1868, when the society was called upon and forced to make a return of this specific property, which was done under protest.

By an Ordinance, passed on the 29th of June, 1793, the City Council of Charleston exempted the South Carolina Society, and all other religious and charitable societies, from any tax "heretofore due, or that may be due to the City." (See Digest City Ordinances from 1783 to 1844, p. 234.) This ordinance was continued in full force, year after year, until repealed by the ordinance of March, 1870; and under its operation the Hibernian Society was exempt from taxation. The first clause in all the ordinances to raise supplies passed by the city from 1800 to 1870, is precisely the same in the classification and enumeration of the subjects of taxation. The first Section of the ordinance of 1868 reads in these words:

"That a tax for the sums, and in the manner hereinafter mentioned, shall be raised and paid into the treasury of the city, for the use and service thereof; that is to say, two dollars in every one hundred dollars of the value of every house, building lot, wharf, or other landed estate, including every building and improvement on lands, under a lease for a term of five or more years, from a religious, charitable or literary society, or under any building lease."

The same words, with the exception of a change in the numerals, are used in the ordinance of 1844, and in every other previous ordinance that has been found. The ordinance of 1869 reads in the same way.

I do not regard the terms of this enactment to be in conflict with the ordinance of 1793, but, on the contrary, they are rather confirmatory of the exemptions therein declared. The inclusion of every building and improvement on land under a lease, for a term of five or more years, from a charitable society,

excludes the property of such society not under such lease, and preserves the exemption of what belongs to the society proper. The maxim *expressio unius est exclusio alterius* applies here. It was brought to my attention, in the investigation of the case, that the ordinance of 1868, which was passed under the administration of the Hon. P. C. Gaillard, Mayor, was not enforced in this particular until after he and a majority of the Council were removed by military orders, and his place filled, first by General Burns, and a few days later by Major Cogswell. It must have been under, and by the direction of this officer, acting as Mayor, that the City Assessor included in his assessment the property of this and other charitable societies. It was so included in error, and the tax cannot be maintained upon a proper legal interpretation of the ordinance.

It was in a similar way that the City Assessor, under the ordinance of 1869, earnestly attempted to subject the property of this society to taxation. Neither of these ordinances gave to the City Assessor the legal right to levy a tax on the property exempted by the ordinance of 1793; the ordinances of 1868 and 1869, instead of repealing the exemption of 1793, extended and confirmed it. The Constitution of 1868 did not of itself render the property liable to taxation, or repeal any existing exemption. It simply declared as the fundamental law the principle which should govern legislation on the subject of taxation. The provisions are all prospective. Section 1, of Article 9, reads: "The General Assembly shall provide by law for a uniform and equal rate of assessment and taxation." Section 5 of the same Article reads: "It shall be the duty of the General Assembly to enact laws for the exemption from taxation of any public schools, etc., but property of associations and societies, although connected with charitable objects, shall not be exempt from State, County or Municipal taxation." In Section 8, Article 9, it is provided that "the corporate authorities of counties, townships, school districts, cities, towns and villages, may be vested with power to assess and collect taxes for corporate purposes, such taxes to be uniform in respect to persons and property, within the jurisdiction of the body imposing the same. And the General Assembly shall require that all the property, except that heretofore exempted within the limits of municipal corporations, shall be taxed for the payment of debts contracted under authority of law."

In 1868 the General Assembly passed an Act providing for the assessment and taxation of property, applying, however, solely to State taxation, and containing no provisions for municipal taxation.

The authority to provide for a uniform and equal rate of taxation by municipal bodies was unquestionably given to the General Assembly by the Constitution, but it was an authority which the General Assembly did not exercise until 1870, and in the absence of any law regulating the subject, the general municipal bodies continued to act under the ordinances existing at the adoption of the Constitution.

"The instrumentality of the Judiciary can be invoked by the Government only to give effect to its laws, civil or criminal, but the judicial power cannot precede that of legislation." (6th McLean, 523.)

The Constitution of the United States gives to Congress the power to establish uniform laws on the subject of bankruptcy, but, as was said by Chief Justice Marshall, in *Crowningshield* vs. *Sturges*,, 4th Wheaton, 196, "it is not the mere existence of the power, but its exercise, which is incompatible with the exercise of the same power by the States." It is not the right to establish these uniform laws, but their actual establishment, which is inconsistent with the partial acts of the States. Until, therefore, the Legislature did establish a uniform tax law for municipal bodies, there was nothing incompatible with the exercise of the taxing power by the municipal bodies. This seems to have been the opinion of the Legislature, for, in the "Act to enforce a uniform system of assessment and taxation by municipal bodies," approved March 1, 1870, the preamble recites the various clauses of the Constitution, giving the power and making it the duty of the Legislature to enact a uniform system of assessment and taxation by municipal bodies, and, in pursuance thereof, enacts that "all municipal corporations are hereby authorized and required to assess all property at its actual value, and lay all taxes thereon at a uniform and equal rate : *Provided*, That all property, and no other, exempted from taxation by the third Section of the Act of the 15th of September, 1868, shall be exempted from taxation by municipal corporations."

It is a cardinal principle of interpretation that, in the construction of a statute, we must regard the old law the evil and the remedy. It is equally clear that we are not permitted, except on the very strongest reasoning, to regard an Act of the Legislature as entirely superfluous and unnecessary. The application of these two rules relieves the case from doubt. If, as is contended, the City Council of Charleston had the power to assess and collect the tax complained of under the Constitution, then the Act of the Legis-

lature that "all municipal corporations are hereby authorized," etc., was superfluous and nugatory; but we are not permitted so to hold; and the converse of the proposition is true, so that the authority to tax grows out of, and depends upon, the Act of March 1, 1870. For all taxes laid since the passage of this Act, I think the relators are liable, but I do not think them liable for the taxes for the years 1868 and 1869; and I, therefore, order that a writ issue prohibiting the City Sheriff of Charleston from enforcing the execution against the relators for the taxes charged for the years 1868 and 1869.

The defendant appealed, in both cases, to the Supreme Court, upon the following grounds:

First. The Court erred in holding that the plaintiff was not liable for the taxes for the year 1868.

Second. For error in holding that the plaintiff is not liable for taxes for 1869.

*Corbin*, City Attorney, for appellant.

*O' Conner, Connor*, for respondents.

[Printed arguments were filed by the counsel on both sides, but as the cases were decided upon the construction of the city ordinances it is deemed unnecessary to report them.]

Aug. 8, 1871. The opinion of the Court was delivered by

MOSES, C. J. The right of the City Council of Charleston to exercise the power of taxation to the fullest extent conferred by its charter is not questioned in either of the cases.

It is competent for a municipal corporation to repeal or limit any grant which it has made, not in the nature of a contract, but while it exists the discretion of those entrusted with the authority is beyond the control of the Courts. They may at any time relinquish, repeal or suspend a tax which they have imposed, without question of their authority again to enjoin it, for their acts are not irrepealable.

"No Legislative body can so part with its powers by any proceeding as not to be able to continue the exercise of them."—Cooley on Constitutional Limitations, 206; *East Hartford* vs. *Hartford Bridge Company*, 10 How., 535.

In the limit within which municipal bodies are competent to legislate their rights and obligations are identical with those of a State Legislature. It will not, however, be assumed that either such a

corporation or Legislature will deprive itself of its power of taxation, or, in the exercise of it, embarrass itself with stipulations or conditions unless it is clearly shewn that the act having that tendency amounts to a contract.

The relators, conceding the effect of these principles, do not claim that their real estate, referred to in the suggestion, was not within the taxing power of the City Council of Charleston, but contend that the said Council, by clear and unambiguous terms, have exempted such property from the general operations of their Acts to raise supplies, so that they are not brought within the provisions of the ordinances of 1868 and 1869, under which the taxes about to be enforced were assessed.

The Hibernian Society of Charleston was incorporated on the 19th day of December, 1805, and the General Lodge of Ancient Free Masons of South Carolina, on the 16th of the same month, in 1818. By an ordinance of the City Council, ratified on 29th of June, 1793, (Comp., 235,) "all and every religious and charitable society was exempted from payment of any city taxes now due or to become due." Neither of the societies before the Court have been assessed for taxes or required to pay them until the proceedings instituted against them, respectively, now sought to be prohibited, were commenced. Their claim is, that under the said ordinance, and the subsequent action of the City Council, their said real estate is exempted from taxation.

It is first objected that these societies are not "charitable societies," and, therefore, not within the terms of the ordinance. This exception proceeds upon the ground that the word "charitable," as therein used, is only to be applied to such institutions as are eleemosynary, and that neither of them has any claim to that character. A civil private corporation may, however, be established for purposes of general charity, and, as such, might be recognized as a charitable society, although the administration of its funds might not be confined to a hospital for the relief of the poor and sick, or a college or academy for the promotion of science and learning.

Nor is the use of the word to be understood in the ordinance, and our Acts of the General Assembly, as defined in *Jones* vs. *Williams,* Amb., 651, with reference to the statute of charitable uses, "as a gift to a general public use, which extends to the rich as well as the poor;" nor is its sense to be restricted to those charities which, by the power which created them, are intended for public benefit without any discrimination as to the persons who are to participate in

their enjoyment. "Charity," as Sir William Grant said in *Morice* vs. *Bishop of Durham*, 9 Ves.; 399, "in its widest sense, denotes all the good affections men ought to bear to each other; in its most restricted sense, relief of the poor. Here its signification is derived chiefly from the Statute of Elizabeth." The judical acceptance in which the term "charitable" is to be taken, when applied to bequests of that nature, is not to determine the interpretation which is to be given to the word in its use by the ordinance. We must look to the sense in which it was intended to be applied. At the time of its passage, with the exception of the "Orphan House," there was not, in the City of Charleston, an institution in its incidents and elements at all approaching that of an eleemosynary kind. In fact, there were then few societies even in the State whose formation was for charitable purposes. Having already intimated that we do not consider it as essential for any society claiming exemption under the ordinance of 1793, to shew that the charities which it administers are purely for public purposes, we think the relators are to be held within it, because the City Council, from the period when the societies first owned real estate in Charleston to 1868, have given a construction to it which it was too late to disregard or change while it was of force. It is true, as it was not in the nature of a contract, they could have repealed it at their pleasure ; but while operative, their action in regard to it for so long a time must be received as the interpretation of their own enactment.

"Where the words of a statute are doubtful, general usage may be called in to explain them, for *optimus legum est consuetudo*."— Dwarris, 702; *King* vs. *Hobb*, 1 T. R., 178. For three-quarters of a century the Council have accepted the ordinance as excepting from city taxes all and every charitable association, and has included these societies among those upon whom it was to act. In good faith, and trusting to the exemption with which they supposed themselves favored, relying on the said ordinance, they might have purchased real estate to a large amount, and appropriated the proceeds in aid of the design of their formation, and after this long acquiescence on the part of the Council, they are now met with the objection that they were never included in the terms of it. It is too late to make such an objection available.

Holding, then, that the relators were among those included in the ordinance of 1793, it remains to be considered whether they are subject to the tax imposed by the ordinance of January 28, 1868, and of January 26, 1869.—3 City Ordinances, 43, 61.

First, as to that of 1868. The ordinances from 1844 to 1851, inclusive (except for the year 1850,) in express words exempt from taxation, "buildings and premises actually occupied as places of meeting by religious, charitable or literary societies: provided that no exemption herein contained shall be construed to extend to the house and buildings and improvements on such land owned, erected or held by any individual or individuals under a lease for a term of five or more years from either of such societies." After the year 1851, the ordinances to raise supplies omitted this express exemption, and, save as to the amount of the tax assessed, were in the words of that of 1868, which is as follows: "Two dollars on every hundred dollars of the value of every house, building, lot, wharf or landed estate, including every building and improvement on lands under a lease for a term of five or more years, from a religious, charitable or literary society, or under any building lease."

The argument on the part of the appellants assumes that the right of these societies to the exemption sought is placed by them on a grant in the nature of a contract. That, however, is not the true view in which their proposition is to be regarded. If it was contended that the City Council had surrendered its right to tax these corporations, then, in the language of Ch. J. Taney, in *Ohio Life Ins. and Trust Company* vs. *Debolt*, 16 How., 435, "neither the right of taxation, nor any other power of sovereignty which the country have an interest in preserving undiminished, will be held by the Court to be surrendered, unless the intention is manifested by words too plain to be mistaken." No relinquishment of the right of taxation is pretended on the part of these societies to have been made by the Council in their behalf. Their right to withdraw the benefit conferred by the ordinance of 1793 is recognized; the ordinance was not a surrender or relinquishment of the power to tax, but only a suspension of it. Its repeal depended on their own pleasure and discretion. That it has been directly repealed is not pretended. The appellant, however, refers its repeal by implication or inference to the direct exemption of charitable societies by the ordinances from 1844 to 1851, and its omission in the subsequent ordinances. This view might have been entitled to some consideration but for the fact that while the ordinances from 1844 to 1851 exempt the buildings and premises actually occupied as places of meeting by religious, charitable and literary societies, and the lands held by them, and except "the houses, buildings and improvements on such lands erected or held by any individual or individuals under a lease

for a term of five years or more from either of such societies," those from 1852 to 1869, not repeating the general exemption, still include in the subjects of taxation, buildings, &c., on lands under a lease "from a religious, charitable or literary society." What societies can be thus referred to, other than those included-in the ordinances of 1844 to 1851? Why was an assessment to be made for improvements on lands held under leases from them, while improvements on lands leased from individuals or other societies (not religious, charitable or literary), were entirely free from the imposition? Were institutions which not only the action of Council had recognized as entitled to favor, but which commend themselves to the respect and gratitude of the public, to be in a worse position and liable to a greater tax than individuals and corporations designed for less laudable purposes? It is no answer that the persons leasing such lands were to meet the tax on the improvements made; for the effect of this would abate the value of the rent, and to that extent reduce it, thus shifting the tax, in fact, on the proprietor.

The inclusion, in the ordinance of 1868, of the improvements on such leased land, shews a clear intent on the part of the Council, that the real property of such corporations, not under lease, is protected by the ordinance of 1793.

While we concur with the Judge below in his construction of the ordinance of 1868, we think that a different rule applies to that of 1869.

The Constitution of the State was adopted in April, 1868, and the said ordinance passed on the twenty-sixth of January, 1869.

The second Section of twelfth Article of the Constitution provides that "the property of corporations now existing, or hereafter created, shall be subject to taxation, except in cases otherwise provided for in this Constitution." The fifth Section of Article ninth specifies the cases, and confines them to "all public schools, colleges and institutions of learning, all charitable institutions in the nature of asylums for the infirm, deaf and dumb, blind, idiotic and indigent persons, all public libraries, churches, and burying grounds," and further declares that "property of associations and societies shall not be exempt from State, County, and municipal taxation," and provides "that this exemption shall not extend beyond the buildings and premises actually occupied by such schools, &c., although connected with charitable objects."

If these relators are within the said fifth Section, then the premises which they actually occupy are not liable to the city tax for 1869.

The Section, however, restricts whatever meaning may have been heretofore given to the term, and defines the nature of the institutions which are to be comprehended in it. Neither the Grand Lodge of Ancient Free Masons of South Carolina, nor the Hibernian Society of Charleston, can be claimed to be embraced within it. The corporations, other than those protected by the said Article, are, therefore, by the Constitution, subject to municipal taxation, and the ordinance of 1869 must be held to apply only to such exemptions as the City Council under it had the power to make. The convention had the right, with the consent of the people, to change and modify all the municipal charters which the State had granted. When the Constitution, therefore, declared that corporations other than those which it excepted shall be subject to taxation, the ordinance of 1793, on which these relators found their right, must be regarded as repealed, and that of 1869 became operative against them.

It is ordered and adjudged that so much of the order of the Circuit Judge as grants the writ of prohibition, for the taxes of 1869, be reversed, and to that extent the motion is granted.

*Willard*, A. J., and *Wright*, A. J., concurred.