Filed 10/15/25

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| HASTINGS COLLEGE CONSERVATION COMMITTEE et al.,<br><br>　　　Plaintiffs and Appellants,<br><br>v.<br><br>STATE OF CALIFORNIA et al.,<br><br>　　　Defendants and Respondents. | A170255<br><br>(San Francisco City & County Super. Ct. No. CGC-22-602149) |

On January 1, 2023, Assembly Bill No. 1936 (2021–2022 Reg. Sess.) (Assembly Bill 1936) changed the name of what was formerly known as "Hastings College of the Law" to "College of the Law, San Francisco" (College).  (Ed. Code, § 92200.)  Assembly Bill 1936 also deleted from Education Code section 92204 the requirement that one member of the College's board of directors "shall always be an heir or representative of S.C. Hastings."

Plaintiffs the Hastings College Conservation Committee and individuals Stephen Hastings Breeze, Stephanie Azalea Brackel, Catherine Torstenson, Scott Hastings Breeze, Collette Breeze Meyers, and Colin Hastings Breeze appeal a judgment entered in favor of defendants State of California (State) and the

College's dean and directors in their official capacities (collectively the College Defendants)[1] on plaintiffs' complaint challenging Assembly Bill 1936. The judgment was entered after the trial court sustained defendants' demurrer without leave to amend. We affirm.

## I.

Born in 1814, Serranus Clinton Hastings (S.C. Hastings) was the first Chief Justice of California and the State's third Attorney General. In addition to holding these public roles, he amassed significant wealth from various real estate ventures and by 1870 became one of the largest landowners in California. In 1878, S.C. Hastings sought to establish the first law school on the West Coast of the United States and proposed the same to the California Legislature. In response, the Legislature enacted a statute that same year titled "An Act to create Hastings' College of the Law, in the University of the State of California" (the Act). (Stats. 1878, ch. 351, p. 533, italics omitted.)

The Act provided "[t]hat S.C. Hastings be authorized to found and establish a Law College, to be forever known and designated as 'Hastings' College of the Law.' " (Stats. 1878,

---

[1] The College Defendants are David Faigman, Simona Agnolucci, Carl Robertson, Shashikala Deb, Michael Ehrlich, Andrew Giacomini, Andrew Houston, Claes Lewenhaupt, Mary Noel Pepys, Courtney Power, and Albert Zecher.

[2] Our recitation of facts is taken largely from our prior opinion in this action. (*Hastings College Conservation Committee v. Faigman* (2023) 92 Cal.App.5th 323, 327–329.)

ch. 351, § 1, p. 533.)  The Act further provided that the College would be governed by a board of directors (Board), independent of the Regents of California, and that the directors "shall always provide for filling a vacancy with some heir or some representative of . . . S.C. Hastings." (*Ibid*.)

The Act's passage was expressly conditioned upon S.C. Hastings's payment of $100,000 into the State's treasury. (Stats. 1878, ch. 351, § 7, p. 534.)  The Act required the State to appropriate seven percent per year of this sum and pay it "in two semi-annual payments to the Directors of the College." (*Id*., § 8, p. 534.)  The Act further stated that "should the State . . . fail to pay to the Directors of said College the sum of seven per cent per annum . . . or should the College cease to exist, then the State . . . shall pay to the said S.C. Hastings, his heirs or legal representatives, the said sum of one hundred ($100,000) thousand dollars and all unexpended accumulated interest." (*Id*., § 13, p. 534.)  The College was established after S.C. Hastings paid $100,000 to the State's treasury.  The Legislature subsequently codified the Act's terms in the Education Code. (See Ed. Code, former § 92200 et seq.)

In 2017, the San Francisco Chronicle published an article titled "The Moral Case for Renaming Hastings College of the Law," which included allegations that S.C. Hastings was involved in fomenting violence and atrocities against Native Americans living in what is present-day Mendocino County.  In response, the College formed the Hastings Legacy Review Committee (HLRC) to consider and make appropriate recommendations to address

3

S.C. Hastings's legacy. It also commissioned a history professor to research and draft a report regarding S.C. Hastings's role in the killing of indigenous people in Northern California in the mid-19th century. In September 2020, Dean Faigman submitted a report to the Board that discussed HLRC's conclusions and recommended that the College retain its name but pursue other restorative justice initiatives. In recommending that the College keep its name, Dean Faigman reasoned that "most of the legal profession has no idea who Serranus Hastings was or that UC Hastings was named after him."

On October 28, 2021, The New York Times published an article questioning the College's name with a headline that S.C. Hastings "masterminded the killings of hundreds of Native Americans." On November 2, 2021, the Board held a special meeting and passed a resolution directing Dean Faigman to "work with the California Legislature, the Governor's Office, and other offices to enact legislation changing the name of the school." A number of other meetings followed, and the Board ultimately passed a resolution to recommend the name "College of the Law, San Francisco" to the Legislature.

Assembly Bill 1936 was passed by the Legislature in August 2022 and signed by the Governor in September 2022. (Stats. 2022, ch. 478.) Assembly Bill 1936 designated the school's name as "College of the Law, San Francisco" and amended various statutes, including sections of the Education Code, to conform to the new name. It also eliminated S.C. Hastings's

4

hereditary seat on the Board.  Assembly Bill 1936 became effective on January 1, 2023.

## II.

Plaintiffs—a College alumni association and various descendants of S.C. Hastings—filed a complaint against the State and the College Defendants.  The complaint included causes of action for declaratory relief against all defendants on the grounds that Assembly Bill 1936 violated the contract clauses of the California and United States Constitutions (first cause of action), constituted an impermissible bill of attainder and ex post facto law (second cause of action), and violated the California Constitution's provision regarding collegiate freedom (third cause of action).  The complaint requested a declaration that the College's name remains "Hastings College of the Law" and that S.C. Hastings's heirs or representatives are still entitled to a seat on the Board.  Against the College Defendants only, the complaint sought injunctive relief to enjoin them from implementing the unconstitutional provisions of Assembly Bill 1936, including the further expenditure of taxpayer funds to change the College's name (fourth cause of action) or to eliminate the hereditary Board seat (fifth cause of action).  Against the State only, the complaint alleged a cause of action seeking specific performance for breach of contract (sixth cause of action) and a cause of action seeking damages for breach of contract (seventh cause of action) on the grounds that the Act constituted a "binding written agreement between the State of

California and S.C. Hastings and his descendants" and that the State breached this agreement by enacting Assembly Bill 1936.

Defendants demurred to the complaint on the ground that it failed to allege facts sufficient to state a cause of action. Following receipt of plaintiffs' opposition and a hearing on the motion, the trial court issued an order sustaining the demurrers without leave to amend. As to the claims steeped in contract law (first, sixth, and seventh causes of actions), the trial court held that plaintiffs "fail[ed] to meet their heavy burden" of establishing that the Act is a contract as opposed to an exercise of ordinary legislative powers. As to the second cause of action, the court held that Assembly Bill 1936 does not constitute a bill of attainder or violate the ex post facto clause because it only "arguably singles out [] Mr. Hastings, who died years ago," and does not punish plaintiffs. With respect to the third cause of action (collegiate freedom), the trial court held that Assembly Bill 1936 does not violate the California Constitution because the College's Board was the impetus for the enactment of Assembly Bill 1936 "and therefore does not present the situation where the Legislature is attempting to dictate university policy." By extension of these conclusions, the court reasoned that plaintiffs' fourth cause of action (waste of taxpayer funds) and fifth cause of action (42 U.S.C. § 1983) failed for lack of an underlying constitutional or statutory violation.

## DISCUSSION

We review de novo an order sustaining a demurrer without leave to amend, exercising our independent judgment to evaluate

6

whether the complaint states a cause of action under any possible legal theory. We treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions, or conclusions of fact or law; we also consider matters that may be judicially noticed. Because we review the court's ruling rather than its rationale, we are not bound by the trial court's stated reasons, and affirm if any ground offered in support of the demurrer was well taken. (See *Walgreen Co. v. City and County of San Francisco* (2010) 185 Cal.App.4th 424, 433.)[3]

## I.

The complaint alleges that (1) the State "entered into a complete contract with S.C. Hastings concerning the College's establishment, name, funding, and governance;" (2) the "California Legislature set forth the material terms of the agreement in its March 26, 1878 Act, which it later codified as California Education Code Section 92200–92212 after S.C. Hastings upheld his end of the bargain;" and (3) the enactment of Assembly Bill 1936 impermissibly impairs the State's obligations under this agreement. Based on these allegations, plaintiffs assert causes of action for breach of contract and for violation of the Contracts Clauses of the state and federal Constitutions (Cal. Const., art. I, § 9; U.S. Const., art. I, § 10, cl. 1), which limit the power of the State to enact legislation modifying preexisting contractual obligations. (*United States Trust Co. v. New Jersey* (1977) 431 U.S. 1, 17.)

---

[3] Plaintiffs do not challenge the denial of leave to amend.

As they do on appeal, in their demurrers defendants argued that the Act was not a contract for two reasons: First, the Legislature did not intend to bind itself contractually, and second, even if it did, it lacked the authority to do so because states cannot bargain away their right to regulate "public matters and bodies." (*East Hartford v. Hartford Bridge Co.* (1851) 51 U.S. 511, 534 (*East Hartford*).) The trial court agreed with the first of these arguments and did not reach the second. Tackling the problem from the other direction, we find it unnecessary to decide whether the language of the Act or the history and circumstances of its adoption evince the requisite intent to contract because we agree with defendants that, under the reserved powers doctrine (see *United States v. Winstar Corp.* (1996) 518 U.S. 839, 888 (*Winstar*)), the Legislature could not contract away sovereign authority to manage a public institution like the College.

Defendants invoke *Newton v. Commissioners* (1879) 100 U.S. 548 (*Newton*), which concerned an 1846 Ohio statute providing that, " 'before the seat of justice shall be considered permanently established at Canfield, the proprietors or citizens thereof shall give bond with good and sufficient security, payable to the commissioners of said county . . . for the sum of $5,000, to be applied in erecting public buildings for said county, and that the citizens of Canfield shall also donate a suitable lot of ground on which to erect public buildings.' " (*Id.* at p. 549.) Numerous citizens of the town executed the bond and conveyed the land, and a courthouse was built. (*Ibid.*) Almost 30 years later,

however, the state enacted legislation moving the seat of justice from Canfield to Youngstown, and several individuals who had executed the bond sued, arguing that the state was contractually bound by the provision in the 1846 statute that the seat of justice would be "permanently established" in Canfield. (*Id.* at pp. 549–552.)

The high court disagreed because "[t]he legislative power of a State, except so far as restrained by its own constitution, is at all times absolute with respect to all offices within its reach." (*Newton, supra,* 100 U.S. at p. 559.) Reviewing prior cases in which the legislative or police power was found not to be subject to contractual restraint, it explained: "They involve *public interests*, and legislative acts concerning them are necessarily *public laws*. Every succeeding legislature possesses the same jurisdiction and power with respect to them as its predecessors. The latter have the same power of repeal and modification which the former had of enactment, neither more nor less. . . . It is vital to the public welfare that each one should be able at all times to do whatever the varying circumstances and present exigencies touching the subject involved may require." (*Ibid.*; cf. *Casey v. Harned* (1857) 5 Iowa 1, 7, 14 [statute's provision that whichever of two places receives the greatest number of votes " 'shall be and remain *forever* afterwards the County Seat of said county' " could mean only that the selected town would remain the county seat "until changed by law"]; *Stevens v. Thames* (1920) 204 Ala. 487, 488 [statute absorbing the Mobile Medical College into the medical department of the University of Alabama, and providing

9

that the "medical department shall remain in Mobile for all time, . . . could be no contractual obligation on the part of the state as to the future maintenance and location of its own agency"].)

Plaintiffs argue that *Newton* is distinguishable because the Act "formed a contract between the State and a *private* individual, S.C. Hastings" and this case "does not concern any alleged *public* contractual interests asserted by the citizens of a municipality." But the individuals who executed the bond and donated land for the courthouse in *Newton* were private citizens, and more importantly, the Court held that the State could not contract away its authority over "all offices within its reach" because it was "vital to the public welfare" that a future legislature "should be able at all times to do whatever the varying circumstances and present exigencies touching the subject involved may require." (*Newton, supra*, 100 U.S. at p. 559.)[4] That is the point of the reserved powers doctrine—that "a state government may not contract away 'an essential attribute of its sovereignty.' " (*Winstar, supra*, 518 U.S. at p. 888.) And what is at issue here is sovereign authority to manage a public entity: There is no dispute that the Act established the College as a public institution affiliated with the University of California,

---

[4] It is true that in *East Hartford*, another case cited by defendants, the high court also addressed the fact that the contract was between the state and a municipal corporation (*East Hartford, supra*, 51 U.S. at p. 534), but *Newton* makes clear that a state cannot contract away its sovereign authority to manage its own institutions regardless of the entity or person with whom the putative contract was made. The reserved powers doctrine is not limited to claimed contracts between public entities.

10

which exercises the powers of the State.  (Stats. 1878, ch. 351, § 2, p. 533; see *Regents of University of California v. Superior Court* (2024) 102 Cal.App.5th 852, 858 ["The California Constitution establishes the Regents as a 'public trust . . . with full powers of organization and government' "]; *City and County of San Francisco v. Regents of University of California* (2019) 7 Cal.5th 536, 545 [noting that the College is "statutorily designated as the law department of the University of California (Ed. Code, § 92201)"]; cf. *Trustees of Dartmouth College v. Woodward* (1819) 17 U.S. 518, 638 [distinguishing private educational corporations from unincorporated public educational institutions that are "controllable by the legislature"].)[5]

Plaintiffs cite *Matsuda v. City and County of Honolulu* (9th Cir. 2008) 512 F.3d 1148, 1154 for the proposition that "a complete list of the 'essential attributes' of sovereignty which may not be contracted away under the reserved powers doctrine has never been expressly established," and aver that they are unaware of any case holding that "the ability to rename a particular public school or eliminate a single board seat reserved for school benefactors" belongs on the list.  But because no

---

[5] We see no merit to plaintiffs' argument that "the reserved powers doctrine does not protect the State Legislature's power to rename the College's or eliminate the hereditary Board seat because the Legislature does not possess that power in the first place."  We conclude in section III below that the Legislature does possess the authority to change the name at the College's request, and in any event, the authority to manage the College is an essential attribute of state sovereignty that may not be bargained away by any public entity.

11

complete list exists, the absence of a case directly on point is not dispositive. In our view, the appellation of a public institution or agency, or the qualifications of individuals entitled to manage it, are matters of public significance to which future changes may be deemed important to advance the institution's obligation to serve the public interest. Plaintiffs have developed no argument to the contrary. Nor have they argued by analogy to any case in which some aspect of a state's authority to manage its own institutions or agencies was held not to be an essential attribute of sovereignty. Accordingly, we conclude that the State cannot have contracted away sovereign authority to change the name of the College or to remove the hereditary board seat.[6]

## II.

Plaintiffs next allege that, by changing the College's name and eliminating the hereditary board seat, Assembly Bill 1936 constitutes a bill of attainder and an ex post facto law in violation of the United States and California Constitutions. We disagree.

## A.

Bills of attainder are prohibited by the United States Constitution. (U.S. Const., art. I, § 10.) " 'A bill of attainder is

---

[6] In their opening brief, plaintiffs did not cite *East Hartford* or *Newton*, nor did they expressly address the reserved powers doctrine more generally. While we have nonetheless considered the arguments offered on that subject in the reply brief, the discussion there focuses on how the doctrine applies in the context of plaintiffs' Contract Clause claim and develops no separate argument that it applies differently to their state-law claims for breach of contract. Our review is limited to issues properly raised and briefed. (*Swain v. LaserAway Medical Group, Inc.* (2020) 57 Cal.App.5th 59, 72.)

12

"punishment" directly inflicted by the legislature on a person or specified class for an action or status taken or existing prior to the date of the enactment.' " (*Alpha Standard Investment Co. v. County of Los Angeles* (1981) 118 Cal.App.3d 185, 189 (*Alpha Standard*).)  A law constitutes an unconstitutional bill of attainder if it satisfies three criteria:  (1) it must specify the affected persons; (2) it must be punitive; and (3) it must fail to provide for the protections of a judicial trial.  (*Selective Service v. Minn. Public Int. Res. Gp.* (1984) 468 U.S. 841, 847 (*Selective Service*).)

Initially, the State argues that Assembly Bill 1936 is not a bill of attainder because it does not single out a particular person or class for punishment as that term has been interpreted under the federal Constitution.  The individual plaintiffs argue that Assembly Bill 1936 identifies S.C. Hastings by name and "sufficiently identifies them as his 'heirs or representatives' for the purpose of subjecting them to punishment—namely, by removing their family name from the College and eliminating their privileged status vis-à-vis the hereditary Board seat."

Assuming, without deciding, that the individual plaintiffs make up an identifiable class, the demurrer was properly sustained because the bill does not punish plaintiffs within the meaning of the bill of attainder clause.  (*See Kaspersky Lab, Inc. v. United States Dep't of Homeland Sec.* (D.D.C. 2018) 311 F.Supp.3d 187, 206 ["Many laws apply with specificity.  It is the inflicting of 'punishment' that is the 'principal touchstone' of a bill of attainder"].)

13

" 'Historically, [a bill of attainder] involved the punishment of death legislatively imposed, but by judicial construction in the United States, the Bill of Attainder Clause also prohibits a "bill of pains and penalties" by which lesser punishment (banishment, punitive seizure of property, imprisonment, etc.) is legislatively imposed on a particular individual or class.' " (*Alpha Standard*, *supra*, 118 Cal.App.3d at p.189.)  Forbidden legislative punishment, however, "is not involved merely because the Act imposes burdensome consequences." (*Nixon v. Administrator of General Services* (1977) 433 U.S. 425, 472 (*Nixon*).)

"In deciding whether a statute inflicts forbidden punishment," the Supreme Court has "recognized three necessary inquiries:  (1) whether the challenged statute falls within the historical meaning of legislative punishment [the Historical Test]; (2) whether the statute, 'viewed in terms of the type and severity of burdens imposed, reasonably can be said to further nonpunitive legislative purposes' [the Functional Test]; and (3) whether the legislative record 'evinces a congressional intent to punish' [the Motivational Test]." (*Selective Service, supra*, 468 U.S. at p. 852; *Legislature v. Eu* (1991) 54 Cal.3d 492, 526.) These three tests are each "independent—though not necessarily decisive—indicator[s] of punitiveness." (*Foretich v. United States* (D.C. Cir. 2003) 351 F.3d 1198, 1218 (*Foretich*).)  Assembly Bill 1936 does not qualify as a bill of attainder under any of these tests.

**1.**

"Traditionally, bills of attainder sentenced the named individual to death, imprisonment, banishment, the punitive confiscation of property by the sovereign, or erected a bar to designated individuals or groups participating in specified employments or vocations." (*SeaRiver Maritime Financial Holdings Inc. v. Mineta* (9th Cir. 2002) 309 F.3d 662, 673.) The removal of the Hastings name from the College and the elimination of the hereditary board seat do not fall within those categories. Plaintiffs argue that "the legislative confiscation of property or vested rights with attendant consequences for the descendants of the attainted person falls squarely within the historical meaning of punishment," but our discussion in section I above rejects the premise on which this argument is based—that S.C. Hastings or the individual plaintiffs had a vested interest in the name of the College or in a reserved seat on its board. Because we disagree that Assembly Bill 1936 works any confiscation of property or interferes with any vested right, we do not see it as analogous to historical punishments that did so, including the "corruption of blood," which prevented heirs from inheriting the attainted person's property. (See *United States v. Brown* (1965) 381 U.S. 437, 441; *Nixon, supra,* 433 U.S. at p. 473, fn. 35.)

Plaintiffs further argue that the bill "marks S.C. Hastings and his descendants with a brand of infamy—a traditional form of reputational punishment 'particularly susceptible to invalidation as a bill of attainder,' and declares their actual or

15

perceived wealth as stemming from the seizure of land through genocidal mass murder."[7]  But the bill imputes no blame to any of S.C. Hastings's descendants for his conduct with respect to California tribes.  It does not directly or implicitly impugn their character.  We see no basis to conclude that the bill causes the individual plaintiffs reputational harm.

As to S.C. Hastings himself, we note first that he died generations ago and is therefore not a party to this lawsuit.  Plaintiffs argue that, as his living descendants, they have standing to seek relief from a bill of attainder against him, but their complaint does not allege that they are acting in any capacity other than as individuals or that they are bringing this claim on his behalf.  Moreover, we have concluded above that Assembly Bill 1936 does not take their property, interfere with their rights, or damage their reputations.  Plaintiffs' effort to liken themselves to heirs disinherited by the "corruption of blood" and to claim standing on that basis is not persuasive.

---

[7] In their opening brief, plaintiffs argue that the bill "requir[es] a biannual 'reading of an annual statement of the history of atrocities committed by S.C. Hastings against the Yuki people,'" but their complaint did not challenge this provision as a bill of attainder.  Moreover, the quoted provision imposes no requirement but is phrased as a "request" to the College's board.  The complaint did allege that certain legislative findings constituted a bill of attainder, but the cause of action was not focused on reputational harms, alleging simply that "[a] dispute has arisen among the Parties concerning whether AB 1936's removal of 'Hastings' from the name of the College and removal of S.C. Hastings' family's hereditary seat on the Board violates the prohibition against bills of attainder."

But even putting aside the threshold problem of whether a claim as to S.C. Hastings has been or could have been asserted by the individual plaintiffs here, we are not convinced that Assembly Bill 1936 falls within the historical meaning of legislative punishment even as to him.  Plaintiffs rely on *Foretich, supra*, 351 F.3d 1198, which concerned a statute "embodying a congressional determination that [the plaintiff] is a child abuser and a danger to his own daughter," and preventing him from securing visitation with her without first obtaining his wife's consent.  (*Id.* at pp. 1213, 1204.)  *Foretich* does contain the language plaintiffs quote—that "the early cases also demonstrate that a statute will be particularly susceptible to invalidation as a bill of attainder where its effect is to mark specified persons with a brand of infamy or disloyalty" (*id.* at p. 1219)—but it cited for that proposition the Supreme Court's observation that bills of attainder included "legislative enactment[s] barring designated individuals or groups from participation in specified employments or vocations, a mode of punishment commonly employed against those legislatively branded as disloyal." (*Nixon, supra*, 433 U.S. at p. 474.)  The court's conclusion in *Foretich* was equivocal:  The challenged statute, "while not squarely within the historical meaning of legislative punishment, is not dissimilar to the types of burdens traditionally recognized as punitive." (*Foretich*, at p. 1220.)

Moreover, even that conclusion reflected the statute's pairing of the "opprobrium of being branded a criminal child abuser" with the "deprivation of parental rights." (*Foretich,*

17

*supra*, 351 F.3d at p. 1220.) Plaintiffs have not identified a historical bill of attainder the only effect of which was to impose reputational harm—still less to do so on a person long since deceased. (Cf. *id.* at p. 1211 ["As Dr. Foretich detailed in the unrefuted affidavit submitted to the District Court, passage of the Act led to harassment by the media, estrangement from his neighbors, and loss of business and professional opportunities"].) Accordingly, plaintiffs have not shown that Assembly Bill 1936 imposes something akin to a punishment historically associated with bills of attainder.

**2.**

Turning to the functional test, the question is "whether the law under challenge, viewed in terms of the type and severity of burdens imposed, reasonably can be said to further nonpunitive legislative purposes." (*Nixon*, *supra*, 433 U.S. at pp. 475–476; *Alpha Standard*, *supra*, 118 Cal.App.3d 185, 191 [under this test " 'we are looking for a "legitimate legislative purpose" to justify the burden placed on a particular class" ' "].) "Courts have conducted this inquiry by examining both the purported ends of contested legislation and the means employed to achieve those ends." (*Foretich*, *supra*, 351 F.3d at pp. 1221, 1222 ["there must be a nexus between the legislative means and legitimate nonpunitive ends"].)

Here, the legislative findings indicate that Assembly Bill 1936 was enacted to address the injustice inflicted on the Yuki people and the Native American people of the state and to begin the healing process for the crimes of the past. (Stats. 2022,

18

ch. 478, § 1(u).) The means imposed—changing the name of the College and removing the hereditary board seat—have a "rational connection" (*Foretich, supra*, 351 F.3d at p. 1221) to that aim. The name and hereditary board seat perpetuate the association between the College (a public institution with a mission to serve the public interest) and S.C. Hastings, an association the College and Legislature sought to sever in light of their conclusions about S.C. Hastings's "significant responsibility" for the harms inflicted. (Stats. 2022, ch. 478, § 1(s).) The purpose of severing that association, however, was not to punish S.C. Hastings or his descendants but "to address the needs of the current generation of Yuki Tribal members and the College's legal community." (*Id.*, § 1(n).)

The bill's reference to "crimes of the past" is not, as plaintiffs suggest, "an unequivocal admission of its punitive intent and effects." The bill does find S.C. Hastings blameworthy, but it is not like the statute in *Foretich*, which adjudged Dr. Foretich a child abuser after the courts consistently found his wife's allegations unproven, and changed the law to deny him visitation with his daughter. (*Foretich, supra*, 351 F.3d at pp. 1203–1204.) S.C. Hastings died more than 130 years before Assembly Bill 1936 was enacted. The Legislature's findings are a reappraisal—highly critical, to be sure—of a historical public figure. He is not and cannot be subjected to punishment by it.

Although plaintiffs characterize the legislation as a "gratuitous besmirching of the Hastings' family legacy," they do

19

not meaningfully address "the magnitude of the burden relative to the purported nonpunitive purposes of the statute." (*Foretich, supra*, 351 F.3d at p. 1222.) The bill imposes no burdens on S.C. Hastings himself and, contrary to plaintiffs' argument, it does not impugn his descendants. The most that can be said is that there is no longer a board seat *reserved* for an heir or representative of S.C. Hastings, but plaintiffs do not offer any argument that this change constitutes a severe burden, and they do not dispute that the individual plaintiffs remain free to seek consideration for any seat on the board. Their continued eligibility to serve demonstrates that Assembly Bill 1936 does not deem them tainted by any relation to S.C. Hastings. It is the *reservation* of a board seat for an heir or representative of S.C. Hastings that, along with the name, publicly signifies the association between him and the College, and is what the bill seeks to end. Accordingly, we do not find the bill punitive under the functional test.

### 3.

"The final test of legislative punishment is 'strictly a motivational one: inquiring whether the legislative record evinces a [legislative] intent to punish.' [Citation.] Under this prong, a court must inspect legislation for a congressional purpose to 'encroach[ ] on the judicial function of punishing an individual for blameworthy offenses.' [Citation.] Courts conduct this inquiry by reference to legislative history, the context or timing of the legislation, or specific aspects of the text or structure of the disputed legislation." (*Foretich*, *supra*, 351 F.3d

20

at p. 1225.) As indicated in our discussion above, we do not find a legislative intent to punish either S.C. Hastings or the individual plaintiffs. A legislative finding of historical wrongdoing as part of an effort to promote restorative justice is not the equivalent of punishing the wrongdoer, let alone his heirs.

Plaintiffs do not discuss the timing of the legislation, but again, the interval of more than 130 years between the death of S.C. Hastings and the enactment of Assembly Bill 1936 renders improbable the existence of a motive to punish him. There is also nothing in the legislation to indicate that it was enacted in response to anything purportedly done or said by his descendants, including the individual plaintiffs. Plaintiffs' suggestion that "the express legislative intent" of Assembly Bill 1936 included securing '[a]n apology from . . . S.C. Hastings [sic] family' " is not supported by the record. Plaintiffs cite committee bill analyses that indicate that Assembly Bill 1936, as proposed, expressed the Legislature's intent to ensure that the College obtain an "apology from the College, the S.C. Hastings family, and all of those associated with the genocide of the Yuki people." This provision, however, was not included in the final bill. As enacted, the bill states that "[i]t is the intent of the Legislature to ensure that the College" engage in several identified restorative justice measures and make "[a]n annual apology on a date to be determined by the Round Valley Indian Tribes, a federally recognized tribal government, its designees of the Yuki Indian Committee, and the College to attest

21

to and acknowledge the social justice components achieved and ongoing efforts."  (Stats. 2022, ch. 478, § 2(b)(19).)

Lastly, plaintiffs repeat their argument that the elimination of the hereditary board seat has "no apparent purpose other than to penalize S.C. Hastings' descendants, simply because of their shared genetic material."  As we have discussed, plaintiffs have not shown that the elimination of the board seat imposes any significant burden on them, let alone punishment, and it serves the remedial purpose of severing the association between the College and a historical figure who the Legislature concluded caused grievous harm to the Yuki people and the Native American people of the state.  The Legislature's desire "to address the needs of the current generation of Yuki Tribal members and the College's legal community" (Stats. 2022, ch. 478, § 1(n)) is not a punitive motivation.

For all of these reasons, we conclude that Assembly Bill 1936 is not a bill of attainder.

### B.

"Article I, section 10, clause 1 of the federal Constitution and article I, section 9 of the state Constitution prohibit the passage of ex post facto laws.  [Citation.]  California's ex post facto law is analyzed in the same manner as the federal prohibition.  [Citation.]  '[T]he ex post facto clauses of the state and federal Constitutions are "aimed at laws that 'retroactively alter the definition of crimes or increase the punishment for criminal acts.' " ' "  (*People v. Alford* (2007) 42 Cal.4th 749, 755.)

22

The individual plaintiffs challenge the court's ruling on the demurrer to this cause of action solely in a footnote. They argue: "Setting aside [Assembly Bill] 1936's unfounded accusations regarding murder and genocide, the remaining accusations about S.C. Hastings are limited to his petitioning the State for the formation of a militia—an action that was legal at the time and amounts to an exercise of Hastings's fundamental right to petition, which is protected by the First Amendment to the U.S. Constitution. To the extent [Assembly Bill] 1936 seeks to retroactively criminalize S.C. Hastings' petitioning or other lawful activities, [Assembly Bill] 1936 also violates, at a minimum, the Ex Post Facto Clause."

Putting aside whether this footnote is sufficient to assert a challenge to the court's ruling on this cause of action (see *Golden Door Properties, LLC v. County of San Diego* (2020) 50 Cal.App.5th 467, 554–555), the court properly sustained the demurrer. Generally, both the federal and state constitutional prohibitions on ex post facto laws apply only to criminal statutes. (*Armijo v. Miles* (2005) 127 Cal.App.4th 1405, 1419.) A civil statute may be found to violate the ex post facto clause only " 'if it is " 'so punitive either in purpose or effect as to negate [the State's] intention' to deem it 'civil.' " ' " (*Coats v. New Haven Unified School Dist.* (2020) 46 Cal.App.5th 415, 425 [" 'Only the "clearest proof" will suffice to override the Legislature's stated intent and render a nominally civil statute penal for ex post facto purposes' "].) Assembly Bill 1936 does not meet this standard.

## III.

Article IX, section 9, subdivision (a) of the California Constitution provides in pertinent part: "The University of California shall constitute a public trust, to be administered by the existing corporation known as 'The Regents of the University of California,' with full powers of organization and government, subject only to such legislative control as may be necessary to insure the security of its funds and compliance with the terms of the endowments of the university and such competitive bidding procedures as may be made applicable to the university by statute for the letting of construction contracts, sales of real property, and purchasing of materials, goods, and services." Subdivision (f) further provides: "[The Regents] shall also have all the powers necessary or convenient for the effective administration of its trust . . . . The university shall be entirely independent of all political or sectarian influence and kept free therefrom in the appointment of its regents and in the administration of its affairs." These constitutional "limitations upon the Legislature's power to change the form of government of the university, or to interfere with its internal affairs, apply with equal force to the Legislature's power to affect the internal affairs or form of government of [the College]." (*Coutin v. Lucas* (1990) 220 Cal.App.3d 1016, 1024 (*Coutin*).)

Plaintiffs assert that Assembly Bill 1936's changes to the College's name and governance structure are politically motivated and violate article IX, section 9, subdivision (f) of the California Constitution. The State argues, and we agree, that

24

plaintiffs' claim fails because the College's current Board invited the changes.

The requirement that the College be "kept free" of "political and sectarian influence" operates to protect the independence of the College from state government interference. (*San Francisco Labor Council v. Regents of University of California* (1980) 26 Cal.3d 785, 788–789 [" ' "[The] power of the Regents to operate, control, and administer the University is virtually exclusive. . . ." ' "]; *People v. Lofchie* (2014) 229 Cal.App.4th 240, 254 ["The purpose of designating the University as a public trust was to insulate it from state government, ensuring that the University and its faculty would be 'entirely independent of all political or sectarian influence.' "]; *Coutin, supra,* 220 Cal.App.3d at p. 1024 [describing constitutional provision as limiting "Legislature's power to change the form of government of the university, or to interfere with its internal affairs"].) Plaintiffs have not cited any authority suggesting that this provision prohibits the Board from making decisions regarding the College that are allegedly based on "political or sectarian whim," or prohibits the State from enacting Legislation at the request of the Board.

Plaintiffs' citation to the historic language of article IX, section 9, subdivision (f) of the California Constitution is misplaced. Prior to 1918, article IX, section 9, read in relevant part, "The University of California shall constitute a public trust, and its organization and government *shall be perpetually continued in the form and character* prescribed by the organic act

25

creating the same . . . ." (Italics added.) The italicized language was interpreted by the California Supreme Court to prevent the Legislature from altering the composition of the College's Board. (*People v. Kewen* (1886) 69 Cal. 215, 216.) This language was eliminated in 1918. The purported "twofold purposes of the amendment" were "[t]o permit the adaptation of the details of the internal organization of the university to meet modern-day requirements" and "to give to the alumni of the university direct representation on the governing body of the university." (*Coutin, supra*, 220 Cal.App.3d at pp. 1022–1023.) Plaintiffs argue that the 1918 amendment was not intended to "diminish the Board's constitutional obligation to refrain from changing the College's form or character" and that "Section 9 is still intended to safeguard changes to 'form and character' especially when based on political or sectarian whim." We disagree.

Contrary to plaintiffs' argument, the amendment quite clearly affected a significant change in the statute: "[B]y deleting that portion of article IX, section 9, that required the organization and government of the university to be perpetually continued in the form prescribed by its Organic Act, the amendment rendered the provisions of the Hastings Act (as codified in the Political Code and subsequently in the Education Code) subject to modification." (*Coutin, supra*, 220 Cal.App.3d at p. 1023.) Thus, nothing in the provision, as it now reads, prohibits the Board from making, or to the extent necessary, requesting from the Legislature, changes to the provisions of the Act, now codified in the Education Code. Accordingly, the

26

provision of Assembly Bill 1936 that changed the name of the College at the request of the Board did not violate article IX of California Constitution.

As plaintiffs argue, this reasoning does not necessarily resolve the dispute about the provision eliminating the hereditary seat because no such request was expressly made by the Board. The State responds, "That the [B]oard's focus was on removing 'Hastings' from the name of the College—rather than converting the designated board seat (itself an unusual feature for a public institution)—does not alter that the College [B]oard 'was the impetus' behind the changes accomplished by [Assembly Bill] 1936." We agree with the State.

The resolution adopted by the Board, which directed the Chancellor and the Dean to pursue legislation changing the College's name, makes clear that the separation of the Hastings name from the college was "vital" to the "process of reconciliation between the College and members of the affected Tribes." Changing the name of the College, however, was not the singular focus of the resolution. Rather, the Board indicated that the ultimate objective of substantive restorative justice would require other additional efforts. The elimination of the hereditary board seat is entirely consistent with the Board's resolution. Although framed as an issue of standing, which we need not reach, College Defendants reasonably assert that plaintiffs "have no business attempting to enforce the Board's right [to be free of political or sectarian influence] against the Board itself."

27

## IV.

State common law and Code of Civil Procedure section 526a authorize taxpayers to sue to enjoin the State from carrying on any unlawful actions. (See, e.g., *Weatherford v. City of San Rafael* (2017) 2 Cal.5th 1241, 1249.) Title 42 of United States Code, section 1983, provides a cause of action against any person acting under color of state law who deprives another's rights guaranteed by the United States Constitution, including the right not to have a state impair its obligations of contract. (*Southern California Gas Co. v. City of Santa Ana* (9th Cir. 2003) 336 F.3d 885, 886–887.)

Plaintiffs acknowledged that their claims based on the above authority are "derivative" of the claims discussed in the preceding sections. Because we have upheld the court's rulings on the underlying causes of action, the court's order sustaining the demurrers to the derivative causes of action must be upheld as well.

## DISPOSITION

The judgment is affirmed. Respondents are entitled to recover their costs.

GOLDMAN, J.

WE CONCUR:

BROWN, P. J.
CLAY, J. *

---

*Judge of the Alameda Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

28

| | |
|---|---|
| Trial Court: | Superior Court of the City and County of San Francisco |
| Trial Judge: | Honorable Richard B. Ulmer |
| Counsel for Plaintiffs and Appellants: | Michael Yamamoto, Gregory R. Michael, Dorothy Yamamoto<br>Dhillon Law Group Inc., Harmeet Dhillon, Mark P. Meuser, Karin Sweigart |
| Counsel for College Defendants and Respondents: | Wilkie Farr & Gallagher, Cooley, Benedict Y. Hur, Eduardo E. Santacana, Joshua D. Anderson |
| Counsel for State of California Defendant and Respondent: | Rob Bonta<br>Attorney General of California<br>Tamar Pachter<br>Senior Assistant Attorney General<br>Lisa W. Chao<br>Supervising Deputy Attorney General<br>Kara Siegel<br>Deputy Attorney General |